## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **VAUGHN MEDICAL EQUIPMENT** | § | |
| **REPAIR SERVICE, L.L.C.** | § | |
| | § | **CIVIL ACTION NO.: 2:10-cv-124** |
| *Plaintiff*, | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **JORDAN RESES SUPPLY COMPANY,** | § | **SECTION: "    " (  )** |
| **RESPIRONICS, INC., a/k/a PHILIPS** | § | |
| **RESPIRONICS, and RESMED CORP.** | § | |
| | § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT

This case arises as a result of Defendants' racially- and economically-motivated efforts to drive Plaintiff Vaughn Medical Equipment Repair Service, L.L.C. ("Vaughn Medical"), and other so-called "nigger companies," out of business through a series of coordinated, illegal acts, including extortion, price-fixing, boycott, exclusivity arrangements, refusals to deal, bribery, defamation, and other predatory business practices. See Ex. A, Whistle Blower Letter. Under the leadership and guidance of Vietnam-Veteran and bronze-star-recipient John Vaughn, Vaughn Medical became a leading distributor of medical supplies and equipment to private citizens and governmental agencies, including the U.S. Department of Veterans Affairs ("the VA"). See Ex. B, Plaque of John Vaughn. Through Mr. Vaughn's business acumen, and personal allegiance to his fellow veterans, Vaughn Medical consistently has sold its supplies and equipment to the VA

at significantly-reduced rates, simultaneously saving American taxpayers substantial amounts of money while permitting the VA to treat more disabled veterans. In fact, Vaughn Medical's very purpose is best summed up by its motto: "Serving those who served our Country."

Disgusted by Vaughn Medical's willingness and ability to sell its products to the VA at such a reduced rate, if not more so by the color of Mr. Vaughn's skin, Defendants embarked on a nefarious campaign to drive Vaughn Medical into bankruptcy, which continues to this day. As a result of Defendants' actions, Vaughn Medical has been deprived of a level playing field, divested of its right to open competition, and subjected to unwarranted public embarrassment. On a grander scale, Defendants' conduct has cost American taxpayers millions of dollars and has deprived countless disabled veterans of much-needed medical treatment. Indeed, if the VA purchased products from Vaughn Medical, as opposed to Defendants, the VA would be able to treat countless of additional veterans per year and, in turn, save the lives of thousands of our brave veterans.

As a result, Vaughn Medical brings this Original Complaint against Defendants Jordan Reses Supply Company, Respironics, Inc., and ResMed Corporation, and would show the Court as follows:

## I.

## JURISDICTION AND VENUE

1.      This is an action brought to recover damages (1) for various violations of the federal antitrust statutes, namely the Sherman and Clayton Acts, codified throughout Title 15 of the United States Code, (2) for civil-rights violations, namely the right to make and to enforce contracts, and the right to buy, to sell, and to hold property, free from racial discrimination, under 42 U.S.C. §§ 1981, 1982, 1985, (3) for tortious interference with existing and prospective contracts and business relationships, (4) for libel, slander, and business disparagement, (5) civil

conspiracy, and (6) for unjust enrichment.    Accordingly, this Court has subject matter

jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, 15 U.S.C. § 15, and 42 U.S.C. § 1988.

2.      Venue is proper under 15 U.S.C. § 15 because Defendants can be found and have agents,

employees, and salesmen in this judicial district.    Specifically, Respironics, Inc. has an agent

who resides and works within this judicial district, namely Callie Druilhet Jones.

## II.

## PARTIES

3.      Plaintiff Vaughn Medical Equipment Repair Service, L.L.C. is a limited liability

company duly authorized and existing under the laws of the State of Texas with its principal

place of business in Texas.

4.      Defendant Jordan Reses Supply Company ("Jordan Reses") is a wholly owned subsidiary

of Patton Holdings, Inc. ("Patton Holdings").  Patton Holdings is a Michigan corporation which

maintains its principal place of business at 24 Frank Lloyd Wright Drive, Suite A3300, Ann

Arbor, Michigan 48106.  Through its agents, employees, and/or representatives, Jordan Reses

has engaged in business in the State of Louisiana, maintains a presence in the State of Louisiana,

and committed multiple torts, in whole or in part, in the State of Louisiana, intentionally aiming

its tortious behavior into the State of Louisiana.    Jordan Reses may be served through its

registered agent The Corporation Company, 30600 Telegraph Road, Bingham Farms, Michigan

48025.

5.      Defendant Respironics, Inc., a/k/a Philips Respironics ("Respironics"), is a Delaware

Corporation which maintains its principal place of business at 1010 Murry Ridge Lane,

Murrayville, Pennsylvania 15668.    Through its agents, employees, and/or representatives,

Respironics has engaged in business in the State of Louisiana, maintains a presence in the State

of Louisiana, and has committed multiple torts, in whole or in part, in the State of Louisiana,

intentionally aiming its tortious behavior into the State of Louisiana. Respironics may be served with citation through its registered agent CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808, or through its President and Chief Executive Officer, John L. Miclot, 1010 Murry Ridge Lane, Murrayville, Pennsylvania 15668.

6.      Defendant ResMed Corp. is a Minnesota corporation which maintains its principal place of business at 14040 Danielson Street, Poway, California 92064. Through its agents, employees, and/or representatives, ResMed Corp. has engaged in business in the State of Louisiana, maintains a presence in the State of Louisiana, and has committed multiple torts, in whole or in part, in the State of Louisiana, intentionally aiming its tortious behavior into the State of Louisiana. ResMed Corp. may be served with citation through its registered agent Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129.

### III.
### FACTS

**A.      Continuous Positive Airway Pressure Devices**

7.      Sleep apnea is a disorder that occurs when a person's breathing repeatedly stops and starts. Obstructive sleep apnea is a common form of sleep apnea caused when the upper airway narrows naturally as the muscles relax during sleep. If left untreated, obstructive sleep apnea can be fatal.

8.      The most common treatment for obstructive sleep apnea is the use of a Continuous Positive Airway Pressure device ("CPAP"). This machine stops the obstructive phenomena by delivering a stream of compressed air via a hose to a nasal or full-face mask, splinting the airway so that unobstructed breathing becomes possible. CPAPs are often the best treatment for obstructive sleep apnea because they obviate the need for more invasive treatments, such as surgical intervention, pharmaceuticals, and neurostimulation.

9.      Respironics manufactures CPAPs and CPAP-related products, such as masks, humidifiers, etc.

**B.      The VA's National Sole Source Contract System**

10.     The United States Department of Veterans Affairs ("VA") is an executive department within the federal government charged with providing health care and benefits to America's veterans and their families.  As part of its duties, the VA awards and administers cost-effective national contracts to meet the supply and equipment needs of VA Medical Centers ("VAMCs") around the country.

11.     Like all federal agencies and departments, the VA requires all potential vendors of goods and services to acquire a Federal Supply Schedule ("FSS").  An FSS authorizes vendors to sell goods and services to the federal government at pre-set costs.

12.     The acquisition of a FSS, however, will only get a vendor's foot in the door.  It does not guarantee that any goods or products will ever be sold to the federal government.  It is essentially a predicate to contract.

13.     From 2000-2006, the VA operated under a National Sole Source Contract System. Pursuant to this system, the VA would only purchase products from a designated sole manufacturer.

14.     Likewise, pursuant to federal regulations, manufacturers were not permitted to sell products directly to the VA.  Instead, the VA was required to purchase products through a distributor, who was responsible for acquiring the products from the designated sole manufacturer.  Thus, while the VA may have had numerous FSSs with multiple distributors, the VA in reality would only purchase products from a single distributor.

15.     Among the countless products the VA purchased for the care of veterans were CPAPs and CPAP-related products.  From 2000-2006, Respironics was the VA's sole manufacturer for these products.  Similarly, Respironics would only sell its products to Jordan Reses, a national distributor.  Thus, from 2000-2006, Jordan Reses was the VA's sole distributor of CPAPs and CPAP-related products.

16.     While Respironics would only sell its products to Jordan Reses for distribution to the VA, Respironics would sell its products to other vendors for re-sale to any entity other than the VA.  In doing so, Respironics, however, would sell its products to Jordan Reses at significantly discounted prices.

**C.     The VA Implements a Blanket Purchase Agreement System**

17.     In 2006, the VA terminated its National Sole Source Contract System.  As a replacement, the VA implemented a Blanket Purchase Agreement ("BPA") system.  Pursuant to the BPA system, multiple distributors would still enter into FSSs with the VA.  The VA, however, would then enter into a BPA with a single distributor in which the VA and distributor would contractually agree to buy/sell products at a rate less than the applicable FSS.

18.     From 2006 through 2008, Respironics remained the preferred manufacturer of CPAPs and CPAP-related products.  Likewise, Jordan Reses remained Philips Respironics' sole distributor of these products.  Accordingly, the VA only entered into a BPA with Jordan Reses for the purchase of these products.  Thus, while the VA had implemented a name change to its purchase agreements, the results remained the same.  Only Jordan Reses could sell these products to the VA.

**D.**     **Service-Disabled, Veteran-Owned, Minority-Owned Small Businesses ("SDVOSB")**

19.    In 2004, President George W. Bush issued Executive Order 13360.  Ex. C, Executive Order 13360.  This Order established a federal policy making it a priority for federal agencies and departments, specifically including the VA, to do business with SDVOSB.  This Order originally called for 3% of the federal procurement budget to be used for the purchase of products and supplies from SDVOSB.  Today, the VA is obligated to purchase 7% of all its products and supplies from SDVOSB.  Ex. D, VA Small Business Program Goals for Fiscal Year 2008 and Fiscal Year 2009.  Moreover, the VA is required to give first consideration to SDVOSB when purchasing products and supplies.

**E.**     **Vaughn Medical Appears on the Scene**

20.    Vaughn Medical is a SDVOSB.  It was founded in 1987 by Vietnam War hero John Vaughn, a recipient of numerous medals and ribbons, including the bronze star for valor. Vaughn Medical was originally formed to sell and service scooters and wheelchairs, especially focusing its business towards veterans with VA prescriptions.  But, based on the leadership and business acumen of Mr. Vaughn, Vaughn Medical expanded its business to include the sale of additional products and services.  Despite the expansion and prosperity, Vaughn Medical remained peculiarly interested in serving veterans.

21.    As part of its everyday business, Vaughn Medical would frequently purchase CPAPs and CPAP-related products directly from manufacturers to distribute directly to individuals.  Vaughn Medical frequently purchased these products directly from Respironics, and never had an order rejected for any reason.  But for Vaughn Medical's decision to sell CPAPs to the VA, Respironics would still be selling its products to Vaughn Medical today, albeit at rates still significantly higher than those at which they sell to Jordan Reses.

22.     In 2008, Vaughn Medical decided to expand its services even further and begin selling CPAPs and CPAP-related products directly to the VA.  In April 2008, Vaughn Medical began the FSS process, completed the application, had discussions with the VA, and inquired into all the relevant requirements.

23.     Through its application process, Vaughn Medical learned that, pursuant to the "I-FSS 644 Clause," the VA will only award FSSs to distributors who have an uninterrupted source of supply via a "Letter of Committment."  Ex. E, I-FSS 644 Clause.  Because Respironics was the VA's preferred manufacturer, Vaughn Medical decided to contact Respironics to obtain the necessary "Letter of Commitment."

**F.     The Conspiracy Begins To Appear**

24.     In May 2008, Vaughn Medical approached Respironics about obtaining the "Letter of Commitment."   In this regard, a meeting was held at the offices of Vaughn Medical with Respironics representatives.  Despite the fact that Vaughn Medical had done business with Respironics in the past, and the fact that Respironics would make a profit from Vaughn Medical's FSS, Respironics informed Vaughn Medical that it would not provide the "Letter of Commitment."  Respironics, however, did not object to continue selling products to Vaughn Medical for any purpose other than distribution to the VA.

25.     The following month, retired Army General Remo Butler, the first African-American Green-Beret general, and a member of Vaughn Medical's board of directors, contacted Respironics Senior Vice-President of National Sales Joseph Moffett to discuss the "Letter of Commitment."   During the conversation, Moffett informed General Butler that Respironics "would not and would never" provide a "Letter of Commitment" to Vaughn Medical.  Moffett further told General Butler that Respironics would only sell CPAPs and CPAP-related products

to Jordan Reses for distribution to the VA.  Lastly, Moffett told General Butler that he did not "give a fuck" whether Mr. Vaughn was a distinguished veteran or whether Vaughn Medical was a SDVOSB.

26.     At this time, Vaughn Medical was thoroughly confused and bewildered by Respironics' animosity and unwillingness to conduct business openly and freely.  It would later become readily apparent that Respironics and Jordan Reses had entered into a conspiracy to monopolize the sale of CPAPs and CPAP-related products to the VA and were willing to engage in all sorts of treachery in furtherance of their conspiracy.

**G.      Vaughn Medical Proceeds Forward**

27.     In July 2008, Vaughn Medical submitted its FSS application to the VA without a "Letter of Commitment" from Respironics.  In response, the VA informed Vaughn Medical that it would not be granted a FSS without first obtaining a "Letter of Commitment."  In essence, the VA had turned Vaughn Medicals' fate over to Respironics.

28.     Undaunted by this adversity, General Butler contacted the VA and informed the VA of Respironics' unexplained unwillingness to work with Vaughn Medical.  Ex. F, Email from Gen. Remo Butler to Christina B. Smith.  He likewise informed the VA about his conversation with Moffett.  In reply, the VA advised Vaughn Medical that a little-known and previously-unused subsection of the "I-FSS 644 Clause" would permit Vaughn Medical to obtain a "Letter of Commitment" from a third-party (non-manufacturer) vendor.

29.     Armed with this knowledge, Vaughn Medical located Sleep Management Solutions ("Sleep Management"), a small vendor of sleep-related products located in Lafayette, Louisiana.  Sleep Management agreed to sell Respironics CPAPs and CPAP-related products ("PR CPAPs")

to Vaughn Medical on an uninterrupted supply. In light of this arrangement, the VA awarded Vaughn Medical a FSS on August 15, 2008, which would remain effective through August 2013.

30.     Pursuant to Vaughn Medical's agreement with Sleep Management, Vaughn Medical would have to pay Sleep Management upfront, would have to pay for all shipping costs, and would have to pay higher prices (a middle-man markup) for the PR CPAPs. Ex. G, Letter from Sleep Management to Vaughn Medical. This deal was much different than the deals Respironics had entered into with all of its other vendors, including Sleep Management. Typically, Respironics would give its vendors a ninety-day grace period to pay for products, would provide free two-day shipping, and would sell its products at a discounted rate. Because Respironics would not sell PR CPAPs to Vaughn Medical, Vaughn Medical was forced to take a less favorable deal, and incur much higher costs, to do business with the VA.

31.     After obtaining the FSS, Vaughn Medical attempted to sell PR CPAPs to the VA. Strikingly, despite the added costs incurred by Vaughn Medical, it nonetheless offered to sell these products to the VA at a much lower rate than Jordan Reses.

32.     In Vaughn Medical's first sales attempt, the VA informed Vaughn Medical that a FSS was not alone sufficient to authorize the sale of PR CPAPs to the VA. Instead, Vaughn Medical would need to obtain a BPA as well. The VA, however, also informed Vaughn Medical that the VA already had a BPA with Jordan Reses for the sale of PR CPAPs and was not permitted to enter into a second BPA. Thus, despite the fact that the VA had replaced its National Sole Source Contract system with the BPA system in 2006, the VA still maintained the same sole-source policy.

33.     On information and belief, Vaughn Medical alleges that Defendants improperly exerted pressure on the VA to coerce it into its erroneous decision that Vaughn Medical was not

authorized to do business with the VA. Defendants' efforts were based, in part, on the fact that Vaughn Medical was a minority-run business, thus constituting an unconstitutional effort to disrupt Vaughn Medical's contractual rights. Moreover, Defendants' illegal efforts were solely intended to prevent Vaughn Medical from entering into business with the VA. As such, these actions were not based on any legitimate purpose or for any legitimate function.

34.    At this point, Vaughn Medical enlisted the aid of congressional representatives to combat the VA's attempts to maintain a single-BPA system. Within a short period of time, the VA changed its position. And, on September 4, 2008, the VA entered into a BPA with Vaughn Medical. Now, it appeared as if Vaughn Medical was set to sell PR CPAPs to the VA.

**H.    The Plot Thickens**

35.    Pursuant to its BPA, Vaughn Medical agreed to sell PR CPAPs to the VA at a lower price than Jordan Reses. This was quite remarkable. Under the arrangement between Respironics and Jordan Reses, Respironics would sell PR CPAPs to Jordan Reses at well-below-market rates, and would ship PR CPAPs directly to the VA, thus Jordan Reses did not have to incur shipping expenses, storage expenses, or any middle-man mark-ups. On the other hand, Vaughn Medical had to pay significant shipping costs, storage costs, and mark-ups to Sleep Management. Yet, despite these added expenses, Vaughn Medical was still able to undercut Jordan Reses (demonstrating just how bad Jordan Reses was overcharging the VA and, by extension, all American taxpayers).

36.    Despite its earlier unsuccessful attempts to prevent Vaughn Medical from obtaining a FSS, and to prevent Vaughn Medical from enforcing its BPA, Respironics again tried to subvert Vaughn Medical's right to sell products to the VA. Within two weeks of the VA's award of the BPA to Vaughn Medical, Respironics contacted the VA and instructed it that Vaughn Medical

was not permitted to sell PR CPAPs.  Ex. H, Email from Christina B. Smith to Vaughn Medical. On the very same day, the VA removed all PR CPAPs from Vaughn Medical's BPA without providing Vaughn Medical prior notice or obtaining Vaughn Medical's prior approval.  Ex. I, Emails from Christina B. Smith to Vaughn Medical.

37.     On September 17, 2008, Vaughn Medical met with the VA to discuss why the VA removed the PR CPAPs from the BPA.  The VA informed Vaughn Medical that it needed to "increase its prices" to that of Jordan Reses.  At this point, things began to become clearer. Vaughn Medical, appreciating the history between Respironics and Jordan Reses, began to suspect that these two entities may have been conspiring to prevent Vaughn Medical from competing in the sale of CPAPs to the VA, as well as conspiring to fix the prices that the VA paid for CPAPs.  As previously stated, Defendants' motivation was based, in part, on racial animus.  Likewise, the only purpose of Defendants' conspiratorial efforts was to deprive Vaughn Medical of its contractual rights illegitimately.

38.     In light of this meeting, Vaughn Medical took this issue to Congress again, specifically seeking the aid of Congressman Robert Filner, the Chairman of the Veterans Affairs Committee. Mr. Filner and others representatives contacted the Secretary of the VA about the removal of the PR CPAPs from Vaughn Medical's BPA.  Ex. J, Letter from U.S. Representatives Robert Filner, Sanford D. Bishop, Jr., Sheila Jackson-Lee, and Jesse L. Jackson, Jr. to the VA.  Within two days, and without explanation, the CPAPs were placed back on Vaughn Medical's BPA.  Ex. K.

39.     On October 8, 2008, Vaughn Medical received its first purchase orders from the VA. Finally, all appeared to be well.

**I.    Jordan Reses Enters the Picture; More Pressure is Applied**

40.    In early October 2008, a team of Vaughn Medical personnel attended the "2008 Federal Health Care Industry Conference" in Chicago, Illinois.  During the conference, Frank Czajka, the Chief Operating Officer of Jordan Reses, approached the Vaughn Medical team.   Czajka introduced himself and then informed Vaughn Medical of Jordan Reses's strong influence at Respironics and the VA, suggesting that Vaughn Medical discontinue its efforts to service the VA.  Czajka also warned Vaughn Medical that, because of Jordan Reses's strong influence, "a sole source was going to be given to Jordan Reses shortly."  The purpose of Czajka's unexpected visit was clear:  Jordan Reses wanted Vaughn Medical out of the picture.

41.    Throughout October and November 2008, Vaughn Medical began to make inroads with various VAMCs throughout the country.  By being able to sell the same products as Jordan Reses at a cheaper price, Vaughn Medical was making a name for itself and proving that it was capable and willing to compete.

42.    During this same time period, Respironics became extremely aggravated that one of its vendors, namely Sleep Management, had been selling PR CPAPs to Vaughn Medical.  As such, Respironics began to investigate the matter.  Through this investigation, Respironics began to suspect that Sleep Management was responsible for the sale of PR CPAPs to Vaughn Medical. To discourage this suspected behavior, Respironics threatened Sleep Management with punitive measures if Sleep Management continued to sell PR CPAPs to Vaughn Medical.  Ex. L, Letter from Sleep Management to Vaughn Medical.

43.    As part of its extortionate threats, Respironics explained to Sleep Management that Respironics and Jordan Reses shared the costs of a sales and marketing team and a mutual dedication to provide products to the VA exclusively.  Respironics also stated that Jordan Reses

and Philips Respironics used each other to demonstrate false profits based on their abilities to manipulate the VA and to set prices unilaterally.

**J.      Warranties Become An Issue; Jordan Reses Proposes A Solution**

44.    As manufacturer of the PR CPAPs, Respironics is obliged to warrant its products to the VA in the event of defect or injury.   Although this obligation arises as a matter of law, Respironics saw it as another opportunity to run Vaughn Medical out of business.

45.    In November 2008, Respironics told the VA that it would no longer warrant CPAPs sold to the VA by Vaughn Medical.   Understandably scared by the possible consequences of Respironics' threats, the VA advised Vaughn Medical that it would have to remove PR CPAPs from Vaughn Medical's BPA unless Vaughn Medical was able to come up with a viable alternative.   Once again, Defendants' efforts were motivated, in part, on racial animus. Likewise, the only purpose of these efforts was to deprive illegitimately Vaughn Medical of its contractual rights.

46.    Around the same time, Jordan Reses re-contacted Vaughn Medical about setting up a possible meeting to discuss the parties' relationship.   Interested in what Jordan Reses had to discuss, Vaughn Medical agreed to meet with Jordan Reses.

47.    On November 19, 2008, Czajka and Steve Baugh (President of SleepWell Ventures, which is another subsidiary of Jordan Reses's parent company, Patton Holdings) came to Temple, Texas to meet face-to-face with Vaughn Medical.  Ex.M, Letter from Marcus D. Thierry to Frank Czajka and Steve Baugh.   At the meeting, Czajka and Baugh encouraged Vaughn Medical (1) to leave the VA marketplace, (2) to keep its FSS and BPA dormant (so the VA would not approve any other SDVOSB to take Vaughn Medical's place), and (3) to focus its business on sleep centers.   In return, Jordan Reses offered to enter various joint ventures with

Vaughn Medical and push Vaughn Medical as a vendor of services to the Department of Defense.

48.     All told, the focus of the meeting centered on Jordan Reses' alleged control of the VA and Respironics.  Jordan Reses informed Vaughn Medical that it makes over $30 million a month from the sale of CPAPs and CPAP-related products to the VA (which it then significantly under-reports) and would not let Vaughn Medical disturb this source of income.  Jordan Reses further explained that Vaughn Medical could never compete with Jordan Reses because Jordan Reses always has inventory on hand, does not have shipping costs, and does not carry storage costs.  Jordan Reses essentially admitted that it single-handedly controlled the prices at which the VA purchased products and that it would not permit anyone to interfere with its racket.

49.     Respironics continued to pressure Vaughn Medical into December 2008.  Respironics specifically increased its rhetoric in regards to its warranty of PR CPAPs. In response to mounting pressure from the VA, Vaughn Medical voluntarily removed all PR CPAPs from its FSS and BPA rather than risk their outright cancellation.  Ex. N, Email from Marcus D. Thierry.

50.     After the decision to remove PR CPAPs from its FSS and BPA, Vaughn Medical again contacted members of Congress, seeking their intervention.  As a result of a congressional inquiry, the VA dropped its threat to cancel Vaughn Medical's FSS and BPA, and accepted Vaughn Medical's personal warranty in place of the Respironics warranty.

**K.     Respironic's Non-Agreement**

51.     By mid-December 2008, Respironics' multiple attempts to push Vaughn Medical out of business had failed.  As such, Respironics ostensibly reached out to Vaughn Medical and offered to do business with Vaughn Medical through a distribution agreement.

52.    The prices reflected on the distribution agreement, however, were significantly higher than the prices Vaughn Medical was currently paying its middle-man Sleep Management (and significantly higher than what Respironics charged Jordan Reses and all its other vendors). This, of course, meant that Respironics was drastically increasing its prices to Vaughn Medical above market rate to drive Vaughn Medical's prices above those offered by Jordan Reses.

53.    In an effort to appease the VA, and because Vaughn Medical would still receive some sales through its preferential status as a SDVOSB, Vaughn Medical submitted a signed, executed distribution agreement between itself and Respironics. When the VA contacted Respironics to validate the distribution agreement, Respironics informed the VA that it had rescinded the distribution agreement, alleging that the distribution agreement only covered sales to non-VA entities. As such, it became apparent that this was just another attempt by Respironics to discredit Vaughn Medical in the eyes of the VA and to thwart Vaughn Medical's sales.

54.    As a consequence of submitting the so-called distribution agreement with Respironics, Vaughn Medical unwittingly invalidated its pre-existing "Letter of Commitment" with Sleep Management. Accordingly, after Respironics reneged on the distribution agreement, Vaughn Medical re-submitted its third-party "Letter of Commitment" with Sleep Management to the VA.

55.    This time around, the VA refused to accept the same "Letter of Commitment" which it had previously accepted, re-asserting its original position that Vaughn Medical needed a "Letter of Commitment" from Respironics. Thus, Vaughn Medical was left without any uninterrupted source of supply and unable to satisfy its FSS obligations. As a result, Respironics, through its backdoor maneuvering, had finally ousted Vaughn Medical from its right to sell PR CPAPs to the VA.

56.     On information and belief, Vaughn Medical alleges that Defendants improperly exerted pressure on the VA to coerce it into its erroneous decision that Vaughn Medical could no longer operate under the previously-accepted "Letter of Commitment."  Defendants' efforts were based, in part, on the fact that Vaughn Medical was a minority-run business, thus constituting an unconstitutional effort to disrupt Vaughn Medical's contractual rights.  Moreover, Defendants' illegal efforts were solely intended to prevent Vaughn Medical from entering into business with the VA.  As such, these actions were not based on any legitimate purpose or for any legitimate function.

57.     Despite this powerful blow to Vaughn Medical, Respironics and Jordan Reses, through a series of coordinated communications, continued their assault on Vaughn Medical.  Both entities informed the VA that only Jordan Reses could sell PR CPAPs to the VA, thus publicly confirming an already-implemented illicit exclusivity arrangement.  Ex. O, Philips Respironics & Jordan Reses Memorandums.  These communications were meant to bury any hopes that Vaughn Medical had of re-obtaining a "Letter of Commitment."

58.     Fortunately, the VA rejected Respironics' and Jordan Reses' position.  The VA, however, did send out an email to all the VAMCs in the country, informing them that, although there were four companies with BPAs to sell CPAPs at that time, VAMCs were discouraged from purchasing CPAPs from any company other than Jordan Reses.  Thus, not only had Respironics essentially taken away Vaughn Medical's contractual rights, Respironics and Jordan Reses then kicked Vaughn Medical when it was down.

**L.     Racial Animus**

59.     At this time, there were four companies with BPAs: Vaughn Medical, Jordan Reses, the Medical Place, and Dimensions Medical Supply.  Vaughn Medical, Medical Place, and

Dimensions Medical were all minority and/or veteran owned small businesses. Jordan Reses, on the other hand, was not minority owned, veteran owned, or a small business. While this status may have appeared to be disadvantageous to Jordan Reses, Jordan Reses was able to play up racially-motivated animus to keep down Vaughn Medical and the other two companies, which Jordan Reses and Philips Respironics referred to as "nigger companies." Ex. A.

60.    Thus, not only were the Defendants economically motivated to drive Vaughn Medical out of business, they were also motivated by abhorrent racial animus. This racial animus has driven all of Defendants' decisions *vis-à-vis* the sale *vel non* of products to the VA, Vaughn Medical, Medical Place, and Dimensions Medical.

**M.    Vaughn Medical Refuses to Surrender**

61.    In April 2009, despite its recent battering from Defendants' illegal practices, Vaughn Medical held a meeting with the Undersecretary of the VA in Washington, D.C. At the meeting, the Undersecretary stated that Vaughn Medical was correct in its long-standing belief that it could sell PR CPAPs to the VA with a third-party "Letter of Commitment," and that the current administration would enforce Vaughn Medical's "Letter of Commitment" with Sleep Management.

62.    At this point, it looked as if Vaughn Medical had finally overcome the last of Defendants' obstacles. Unfortunately, Respironics and Vaughn Medical, in response, only increased their illegal efforts.

**N.    Respironics' and Jordan Reses' Predatory Behavior Increases**

63.    Sometime in the Spring of 2009, local representatives for Jordan Reses began going into VAMCs around the country to obtain the serial numbers off the PR CPAPs sold from Vaughn Medical to the VAMCs. By gaining access to VA storage facilities, the Jordan Reses

representatives could write down the serial numbers for each PR CPAP sold by Vaughn Medical. In turn, Jordan Reses would give these serial numbers to Respironics. Using the serial numbers, Respironics would than check its database to determine which third-party vendors had been selling PR CPAPs to Vaughn Medical. By doing so, Respironics was able to determine definitively that Sleep Management had been Vaughn Medical's sole source of CPAPs and had continued courageously to sell CPAPs to Vaughn Medical, even after Respironics' previous extortionate threats.

64.    On May 21, 2009, Respironics contacted Sleep Management and strong-armed it into ceasing its business with Vaughn Medical, threatening to run Sleep Management out of business. Ex. P, Letter from Sleep Management, LLC to Vaughn Medical. When Sleep Management told Respironics that Sleep Management "felt honored" and "duty-bound to support [John Vaughn] as a highly decorated Vietnam-Veteran whose only goal was to provide quality service at great pricing," Respironics responded that it "did not give [a] Fuck." *Id.*

65.    Still undeterred by Defendants' tactics, Vaughn Medical found additional third-party vendors willing to provide it with CPAPs. As such, Jordan Reses has continued its efforts to find ways into VAMC storage rooms to obtain serial numbers.

66.    In addition, Respironics informed all of its suppliers nationwide that they were not authorized to sell products to Vaughn Medical and that any attempt to purchase products in bulk will be viewed an as attempt to sell to Vaughn Medical. Ex. Q, Email to Vaughn Medical. To this day, Defendants are still trying to find the vendors who are selling products to Vaughn Medical. If these vendors are located, Defendants will surely strong-arm them into ceasing business with Vaughn Medical or drive them out of business altogether.

67.     Simultaneous with these efforts, Defendants had their local representatives disparage Vaughn Medical to VAMCs around the country.   Specifically, countless representatives personally made defamatory statements regarding Vaughn Medical.  These statements included, but were not limited to, the following: (1) Vaughn Medical could not meet timelines, (2) Vaughn Medical was not authorized to sell CPAPs, (3) Vaughn Medical would not repair damaged CPAPs, (4) Vaughn Medical would not warrant damaged CPAPs, (5) Vaughn Medical lacked integrity, (6) Vaughn Medical was dishonorable, etc.

68.     Furthermore, Jordan Reses, at the behest of Respironics, even faxed out letters to every VA staff member that purchases CPAPs, calling into question the honesty and integrity of Vaughn Medical.  Ex. A.  Ironically, these tactics were named the "Honesty, Ethics and Integrity Campaign."   The obvious purpose of these attacks, however, was to undermine Vaughn Medical's credibility so that the VA would stop buying from Vaughn Medical altogether. Defendants' efforts were based, in part, on the fact that Vaughn Medical was a minority-run business, thus constituting an unconstitutional effort to disrupt Vaughn Medical's contractual rights.   Moreover, Defendants' illegal efforts were solely intended to prevent Vaughn Medical from entering into business with the VA.   As such, these actions were not based on any legitimate purpose or for any legitimate function.

69.     In addition, Sean Patton, the Jordan Reses Northeast Region Manager of Sales and son of Jordan Reses President Tim Patton, made numerous defamatory remarks about Vaughn Medical to employees of the Lexington, Kentucky VAMC.  He also offered to make the Lexington VAMC a special deal by selling it PR CPAPs at a price lower than Vaughn Medical and lower than the prices Jordan Reses offered all the other VAMCs.  This tactic was strictly forbidden by VA-procurement policies.

70.    In June 2009, both Respironics and Jordan Reses once again informed the VA that they had entered into another illegal exclusivity agreement whereby only Jordan Reses could sell PR CPAPs to the VA.  Ex. R, Letter from Barry Thwaits to Carol O'Brien; Ex. S, Email from Nancy Keating to Vaughn Medical.  Not coincidentally, this exclusivity agreement runs through August 2013 — when Vaughn Medical's FSS and BPA terminate.

**O.    Respironics' and Jordan Reses' Behavior Still Persists**

71.    Despite every illegal and unsavory attempt by Defendants to run Vaughn Medical out of business, Vaughn Medical has been able to remain a profitable business.  This is because of Vaughn Medical's willingness and ability to sell CPAPs and CPAP-related products at a significantly reduced rate to the VA.  In fact, if the VA purchased these products from Vaughn Medical alone, and not Jordan Reses, the VA would save millions of dollars each year.  This money would, in turn, permit the VA to treat approximately thousands of additional veterans per year or hire hundreds of additional new employees.

72.    Although it drastically underreports its income, Jordan Reses, by admission, profits by more than $300 million per year through its sale of CPAPs to the VA alone.  This is due to Jordan Reses' ability to overcharge the VA through its collusion with Respironics.  In order to sustain these enormous profits, Jordan Reses and Respironics are continuously striving to drive Vaughn Medical out of business.

73.    Because of Jordan Reses' and Respironics' resources and motivation, Vaughn Medical's continued existence remains precarious day-to-day.  These entities are currently investigating how Vaughn Medical has been able to set up its supply lines.  If they ever ascertain Vaughn Medical's methods, they will surely drive Vaughn Medical into bankruptcy, thereby squashing

the only entity that has ever challenged the monopoly that these entities have illegally established.  Ex. T, Email (Redacted).

74.    As one of its most recent examples of illegality, Defendants have falsified correspondence from the VA.  Recently, the VA sent out correspondence listing the five entities now currently capable of selling CPAPs to VAMCs, and stating that VAMCs should buy products from SDVOSBs as their first choice.  Ex. U, Email from Michael Barnes.  This list, of course, included Vaughn Medical at the forefront as it has been the leading SDVOSB in the field.  Defendants, however, doctored the correspondence to read that Vaughn Medical was no longer permitted to sell CPAPs.

75.    Defendants' representatives have then gone into VAMCs across the country, and continue to do so today, and shown the falsified correspondence to the VAMCs in an attempt to destroy Vaughn Medical's credibility and ability to make sales.  Ex. U, Falsified Email from Michael Barnes.  As a result of these efforts, multiple VAMCs have suspended or terminated their relationships with Vaughn Medical.

76.    Defendants' efforts were based, in part, on the fact that Vaughn Medical was a minority-run business, thus constituting an unconstitutional effort to disrupt Vaughn Medical's contractual rights.  Moreover, Defendants' illegal efforts were solely intended to prevent Vaughn Medical from entering into business with the VA.  As such, these actions were not based on any legitimate purpose or for any legitimate function.

**P.    ResMed Joins the Conspiracy**

77.    Because Vaughn Medical has continued to exist in the face of Respironics' and Jordan Reses' illegal scheme and activities, these entities have strengthened their efforts by recruiting

another entity into their conspiracy: ResMed Corporation.  Since early-to-mid 2009, ResMed has

been conspiring with Respironics and Jordan Reses to drive Vaughn Medical out of business.

78.    In addition to CPAPs, the VA also purchases CPAP masks, which are the CPAP

component that fit over a patient's mouth and into which the CPAP is able to deliver its burst of

air.  Unlike the actual CPAP, these component parts must be replaced every few months.

79.    From at least 2000 through the summer of 2009, the VA singularly purchased CPAP

masks manufactured by Respironics.  In the summer of 2009, if not sooner, the VA was

informed through a Whistle Blower letter that Respironics was manufacturing its CPAP masks in

China.  Ex. A.  This was a clear and unjustified violation of federal regulations, which strictly

prohibit the sale of products made in China.  Soon after the VA received the Whistle Blower

letter, it removed all Respironics CPAP masks from all FSSs and BPAs.

80.    Based on the void left by this removal, the VA began to purchase CPAP masks

manufactured by ResMed Corp.  Because of this circumstance, Respironics and Jordan Reses,

either jointly or separately, reached out to ResMed Corp. to bring it into their anti-competitive

conspiracy.  ResMed Corp. willingly agreed to join up with Respironics and Jordan Reses to

force out any other potential competitors, including Vaughn Medical.

81.    Having joined this illegal conspiracy, ResMed Corp. began its own efforts in furtherance

of the conspiracy.  As one of its most recent examples of illegality, Defendants have falsified

correspondence from the VA.  Recently, the VA sent out correspondence listing the five entities

currently capable of selling CPAPs and CPAP-related products to VAMCs, and stating that

VAMCs should buy products from SDVOSBs as their first choice.  Ex. V.  This list, of course,

included Vaughn Medical at the forefront as it has been the leading SDVOSB in the field.

ResMed Corp., however, doctored the correspondence to read that Vaughn Medical was no longer permitted to sell CPAPs or CPAP-related devices.

82.    Defendants' representatives have then gone into VAMCs across the country, and continue to do so today, and shown the falsified correspondence to the VAMCs in an attempt to destroy Vaughn Medical's credibility and ability to make sales.  Ex. W, Falsified Email from Michael Barnes.  As a result of these actions, many VAMCs have terminated, suspended, or reduced their relationships with Vaughn Medical.

83.    Vaughn Medical alleges that Defendants intentionally and maliciously lied to VA in its illicit attempts to force the VA to stop purchasing products from Vaughn Medical.  Defendants' efforts were based, in part, on the fact that Vaughn Medical was a minority-run business. Moreover, Defendants' illegal efforts were solely intended to prevent Vaughn Medical from maintaining its into business with the VA.  As such, these actions were not based on any legitimate purpose or for any legitimate function.  They were, instead, a sham

84.    On August 17, 2009, Defendants contacted Sleep Management and told it that Vaughn Medical is a fraud and that ResMed Corp. and Respironics are going to send Mr. Vaughn to jail.

85.    On August 18, 2009, Defendants attempted to contact John Vaughn over the phone at multiple times.  David Vaughn (John's son and a Vaughn Medical officer), however, answered the calls.  Defendants personally threatened to have John Vaughn — the same John Vaughn who is a disabled war hero, a preacher, and has wanted nothing more but to help his fellow soldiers in need — thrown into jail and to bring frivolous lawsuits against him in Defendants' continued efforts to drive Vaughn Medical out of business.  These telephone calls were further confirmed by Cynthia Fitzgerald, who is the owner and operator of Dimensions Medical Supply, and Mike Moore, the owner and operator of Sleep Management.

86.    On August 19, 2009, Defendants again contacted Sleep Management.  They each told Mike Moore that John Vaughn decided the previous night to cease all efforts to sell CPAPs and CPAP-related devices to the VA.  These statements were outright lies.

**Q.    The Conspiracy Continues Today**

87.    Through the present, Defendants have continued their illegal activities.  They have continued to disparage Vaughn Medical to VAMCs, to continue extorting Vaughn Medical's third-party suppliers, to refuse to deal with Vaughn Medical, and to commit innumerable anticompetitive acts.

88.    For instance, ResMed Corp. terminated its contract with Sleep Management after learning that Sleep Management was providing CPAPs and CPAP-related devices to Vaughn Medical.  This action, and countless others, have been on-going and will continue to occur without the necessity of Court intervention.

**IV.**

**CAUSES OF ACTION**

**Violations of the Sherman and Clayton Acts**

89.    Vaughn Medical re-alleges each of the foregoing paragraphs.

90.    Based upon the facts stated above and additional evidence to be presented at trial, Defendants have acted individually and in concert, combination, and conspiracy in violation of 15 U.S.C. §§ 1, 2, 13, 14, and 15.  Defendants' actions have been intentional, willful, malicious, and flagrant.

91.    Defendants have entered into a trust and conspiracy in unreasonable restraint of trade by agreeing amongst themselves to commit numerous anti-competitive acts aimed at driving Vaughn Medical and all actual and potential customers out of business.  These acts include but

are not limited to: refusing to sell products to Vaughn Medical, refusing to deal with Vaughn Medical, entering into exclusivity agreements, boycotting the sale of products to all persons other than Jordan Reses, extorting and threatening third-party suppliers, refusing to deal with third-party suppliers who conduct business with Vaughn Medical, illegally and intentionally conspiring with governmental officials to deprive Vaughn Medical of its right to make and to enforce contracts, setting, fixing, and controlling the prices at which products are sold to the VA, refusing to sell products to Vaughn Medical and other entities at the same prices at which products are sold to Jordan Reses and other entities, refusing to offer Vaughn Medical the same services, facilities, rebates, and discounts it has offered to Jordan Reses and other entities, tampering with Vaughn Medical's products, making maliciously and intentionally false statements, including race-based slurs, regarding Vaughn Medical, offering special deals to certain VAMCs to entice them into refusing to deal with Vaughn Medical, falsifying official governmental documents, passing off falsified governmental documents as true and correct copies, cutting off Vaughn Medical's supply lines, and other illegal acts.

92.      Defendants have monopolized, attempted to monopolize, and conspired to monopolize the sale of CPAPs and CPAP-related products to the VA by agreeing amongst themselves to commit numerous anti-competitive acts, including but not limited to the following: refusing to sell products to Vaughn Medical, refusing to deal with Vaughn Medical, entering into exclusivity agreements, boycotting the sale of products to all persons other than Jordan Reses, extorting and threatening third-party suppliers, refusing to deal with third-party suppliers who conduct business with Vaughn Medical, illegally and intentionally conspiring with governmental officials to deprive Vaughn Medical of its right to make and to enforce contracts, setting, fixing, and controlling the prices at which products are sold to the VA, refusing to sell products to Vaughn

Medical and other entities at the same prices at which products are sold to Jordan Reses and other entities, refusing to offer Vaughn Medical the same services, facilities, rebates, and discounts it has offered to Jordan Reses and other entities, tampering with Vaughn Medical's products, making maliciously and intentionally false statements, including race-based slurs, regarding Vaughn Medical, offering special deals to certain VAMCs to entice them into refusing to deal with Vaughn Medical, falsifying official governmental documents, passing off falsified governmental documents as true and correct copies, cutting off Vaughn Medical's supply lines, and other illegal acts.

93.     Defendants have committed, induced, and conspired with each other to commit price discrimination, service discrimination, facility discrimination, rebate and discount discrimination by agreeing amongst themselves to commit numerous anti-competitive acts, including but not limited to the following: offering to sell and selling products to Jordan Reses at a lower price than any other competitors, refusing to sell products to Vaughn Medical at the same price as Jordan Reses and/or any other customers, offering and providing services to Jordan Reses that are not available to any other competitors, refusing to provide services to Vaughn Medical that they offer and provide to Jordan Reses and/or any other customers, offering and providing the use of facilities to Jordan Reses that are not available to any other competitors, refusing to provide the use of facilities to Vaughn Medical that they offer and provide to Jordan Reses and/or other customers, offering and providing rebates and discounts to Jordan Reses that are not available to any other competitors, refusing to provide rebates and discounts to Vaughn Medical that they offer and provide to Jordan Reses and/or other customers, and other illegal acts.

94.     Defendants have committed, induced, and conspired with each other to not use the products or goods of any other entities by agreeing amongst themselves to commit numerous

anti-competitive acts, including but not limited to the following: refusing to sell products to Vaughn Medical, refusing to deal with Vaughn Medical, entering into exclusivity agreements, boycotting the sale of products to all persons other than Jordan Reses, refusing to deal with other independent suppliers who conduct business with Vaughn Medical, and refusing to sell products to Vaughn Medical and other entities at the same prices at which products are sold to Jordan Reses.

95.     All of Defendants' actions have had a substantial effect on interstate commerce.

96.     All of Defendants' actions have substantially lessened competition and tended to create a monopoly.

97.     All of Defendants' actions are per-se illegal.

98.     To the extent a relevant market is necessary, the relevant market for Defendants' anti-competitive actions is the nationwide sale of CPAPs and CPAP-related products to the VA.

99.     All of Defendants' actions have caused considerable injury to Vaughn Medical.

**Violations of 42 U.S.C. §§ 1981, 1982, 1985**

100.     Vaughn Medical re-alleges each of the foregoing paragraphs.

101.     Based upon the facts stated above and additional evidence to be presented at trial, Defendants have acted individually and in concert, combination, and conspiracy in violation of 42 U.S.C. §§ 1981, 1982, 1985 by willfully, intentionally, maliciously, and flagrantly impeding Vaughn Medical's right to make and to enforce contracts, and right to buy, sell, and hold property, based on racial discrimination.

102.     Defendants have acted in furtherance of their conspiracy by engaging in the following acts, all of which were motivated, at least in part, by the fact that Vaughn Medical is a minority-

owned business: refusing to sell products to Vaughn Medical, refusing to deal with Vaughn Medical, entering into exclusivity agreements, boycotting the sale of products to all persons other than Jordan Reses, extorting and threatening third-party suppliers, refusing to deal with third-party suppliers who conduct business with Vaughn Medical, illegally and intentionally conspiring with governmental officials to deprive Vaughn Medical of its right to make and to enforce contracts, setting, fixing, and controlling the prices at which products are sold to the VA, refusing to sell products to Vaughn Medical and other entities at the same prices at which products are sold to Jordan Reses and other entities, refusing to offer Vaughn Medical the same services, facilities, rebates, and discounts it has offered to Jordan Reses and other entities, tampering with Vaughn Medical's products, making maliciously and intentionally false statements, including race-based slurs, regarding Vaughn Medical, offering special deals to certain VAMCs to entice them into refusing to deal with Vaughn Medical, falsifying official governmental documents, passing off falsified governmental documents as true and correct copies, cutting off Vaughn Medical's supply lines, and other illegal acts.

103.    All of Defendants' actions have caused considerable injury to Vaughn Medical.

**Tortious Interference**

104.    Vaughn Medical re-alleges each of the foregoing paragraphs.

105.    Based on the facts stated above, and additional evidence to be presented at trial, Defendants, acting individually and in concert, combination, and conspiracy tortiously interfered with Vaughn Medical's existing and prospective business relationships and contracts. Defendants acted maliciously by intentionally interfering with and preventing the contracts and relationships from occurring, or continuing, for the purpose of harming Vaughn Medical, without privilege or justification.

106.    All of Defendants' actions have caused considerable injury to Vaughn Medical.

## Defamation

107.    Vaughn Medical re-alleges each of the foregoing paragraphs.

108.    Based on the facts stated above, and additional evidence to be presented at trial, Defendants, acting individually and in concert, combination, and conspiracy maliciously and knowingly made false and defamatory statements about Vaughn Medical by publishing without privilege, orally and in writing, that Vaughn Medical was dishonest, lacked integrity, could not meet timelines, was not authorized to sell CPAPs and CPAP-related products, would not repair damaged CPAPs and CPAP-related products, would not warrant damaged CPAPs and CPAP-related products, etc.

109.    All of Defendants' actions have caused considerable injury to Vaughn Medical.

## Civil Conspiracy

110.    Vaughn Medical re-alleges each of the foregoing paragraphs.

111.    Based on the facts stated above, and additional evidence to be presented at trial, Defendants have conspired amongst themselves to (1) violate the Sherman and Clayton Acts, as more fully set out above, (2) violate Vaughn Medical's rights to make and to enforce contracts free from racial discrimination, as more fully set out above, (3) interfere tortiously with Vaughn Medical's existing and prospective business relationships and contracts, and (4) make intentionally and maliciously false statements about Vaughn Medical.

112.    All of Defendants' actions have caused considerable injury to Vaughn Medical.

## Unjust Enrichment

113.    Vaughn Medical re-alleges each of the foregoing paragraphs.

114.    Based on the facts stated above, and additional evidence to be presented at trial, Defendants, acting individually and in concert, combination, and conspiracy obtained benefits belonging to Vaughn Medical through fraud, duress, and the taking of undue advantages.

115.    All of Defendants' actions have caused considerable injury to Vaughn Medical.

## V.

### JURY DEMAND

116.    Vaughn Medical hereby demands a trial by jury on all issues.

### Prayer

Vaughn Medical seeks monetary damages against Defendants, both jointly and severally, in a total sum in excess of the minimum jurisdictional limits of this Court, plus pre-judgment and post-judgment interests, attorneys' fees, punitive damages, treble damages, expert fees, all costs of Court, and all such other relief, to which it may show itself entitled.


Respectfully Submitted,

ARNOLD & ITKIN LLP

*/s/ Robert P. Wynne*
_____
Robert P. Wynne
Louisiana State Bar No. 30123
Kurt B. Arnold *(To be Pro Hac'd)*
Texas State Bar No. 24036150
5 Houston Center
1401 McKinney Street, Ste. 2550
Houston, TX 77010
Telephone: (713) 222-3800
Facsimile: (713) 222-3850

**ATTORNEYS FOR PLAINTIFF**