**VAUGHN MEDICAL EQUIPMENT**
**REPAIR SERVICE, L.L.C.,**

**versus**

**JORDAN RESES SUPPLY**
**COMPANY, RESPIRONICS, INC.,**
**A/K/A/ PHILIPS RESPIRONICS,**
**AND RESMED. CORP.**

**CIVIL ACTION**

**NO. 10-00124**

**SECTION: "C" (4)**

## ORDER AND REASONS[1]

Before the Court is a Motion to Dismiss for improper venue pursuant to Federal

Rule of Civil Procedure 12(b)(3). (Rec. Doc. 14). In the alternative, defendants assert

that this case should be transferred to the Southern District of Texas under 28 U.S.C. §

1404(a). (Rec. Doc. 16).

Also before the Court is a Motion to Dismiss the plaintiff's claims on the

following grounds: (1) the claims are defectively pled; (2) plaintiff alleges no antitrust

injury and therefore fails to state a claim; (3) plaintiff has not and can not plead a relevant

market, thereby precluding the assertion of the antitrust claims; (3) plaintiff's specific

antitrust theories fail as a matter of law; (4) the Noerr-Pennington doctrine bars all

antitrust claims; (5) the facts alleged do not support plaintiff's civil rights claims; (6)

plaintiff's state law claims are unsupported by the facts alleged. (Rec. Doc. 18-1 at 4).

The motions are before the Court on the briefs without oral argument. Having considered

the memoranda of counsel, the record, and the applicable law, the Court DENIES the

defendants' 12(b)(3) motion to dismiss, but GRANTS the defendants' 12(b)(6) motion to

---

[1] Geoffrey M. Sweeney, a student at the Loyola University of New Orleans College of
Law, assisted in the preparation of this Order and Reasons.

dismiss all claims for reasons explained below.  Because the Court grants the 12(b)(6) motion to dismiss, it need not reach the motion to transfer, which is MOOT.

## I. Plaintiff's Allegations[2]

Vaughn Medical Equipment Service, L.L.C. ("Vaughn Medical" or "plaintiff") contracted with defendants Respironics, Inc. ("Respironics") to purchase certain devices used to treat sleep apnea known as continuous positive airway pressure devices and related products ("CPAPs"). (Rec. Doc. 14-1 at 2).  Plaintiff later sought to expand their services to provide CPAPs and related products to the United States Department of Veteran Affairs ("VA"). (Rec. Doc. 4-2 at 9).  However, plaintiff's distribution rights for Respironics' CPAPs and related products were limited by contract to patient-only. (Rec. Doc. 4-2 at 8).  Although the VA and Vaughn Medical mutually sought to establish a relationship, Respironics refused plaintiff's requests to provide a "Letter of Commitment," which the VA required as a means to guarantee an uninterrupted source of supply. (Rec. Doc. 4-2 at 9).  After discussing the matter with the VA, a representative of the plaintiff was informed that the necessary "Letter of Commitment" could be obtained from a third-party vendor. (Rec. Doc. 4-2 at 10).  As a result, plaintiff proceeded to obtain Respironics' CPAPs and related products from third-party vendor Sleep Management Solutions ("Sleep Management"). (Rec. Doc. 4-2 at 10-11).  Despite the added costs of procuring Respironics' products from a third party vendor, Vaughn Medical was selling these products to the VA for less than JRS. (Rec. Doc. 4-2 at 12).

Plaintiff alleges that its efforts to enter the VA market drew the ire of Respironics and Jordan Reses Supply Company ("JRS"), and that the following actions occurred as a

---

[2] The following section details the factual allegations made by the plaintiff, which are accepted as true solely for the purposes of ruling on the motions before the Court.

result.  After procuring the necessary CPAPs through Sleep Management for a short while, Respironics contacted the VA to inform them that Vaughn Medical was not legally authorized to sell Respironics' CPAPs. (Rec. Doc. 4-2 at 13).  As a result, the VA ceased to purchase these products from Vaughn Medical. *Id.*  Shortly thereafter, Vaughn Medical met with the VA to discuss why it would no longer purchase Respironics CPAPs from plaintiff. *Id.*  The VA informed Vaughn Medical that it needed to "increase its prices" to those of the VA. *Id.*  After Vaughn Medical contacted members of the U.S. Congress about the matter, the VA once again began to purchase Respironics' CPAPs from the plaintiff. *Id.*

A few weeks later, representatives of JRS confronted Vaughn Medical personnel at a conference to inform them of JRS' "strong influence at Respironics and the VA." (Rec. Doc. 4-2 at 14).  Despite this alleged power to influence, Vaughn Medical began to increase its sales of Respironics CPAPs to individual VA medical centers throughout the country. *Id.*  At the same time, Respironics began to investigate how Vaughn Medical was obtaining its CPAPs. *Id.*  After learning of the third-party resale system, Respironics threatened Sleep Management with punitive measures unless it agreed to extinguish its relationship with Vaughn Medical. *Id.*  Around this same time, Respironics informed the VA that it would not warrant CPAPs sold to the VA by Vaughn Medical. (Rec. Doc. 4-2 at 15).  The VA advised plaintiff that a viable alternative was necessary. *Id.*  Eventually, after another incident of Congressional intervention, the VA accepted Vaughn Medical's personal warranty in place of Respironics warranty. (Rec. Doc. 4-2 at 16).

JRS then approached Vaughn Medical to discuss terms of a possible business relationship. (Rec. Doc. 4-2 at 15).  In exchange for certain concessions relating to the

VA market, JRS agreed to push Vaughn Medical as a vendor to the Department of Defense. (Rec. Doc. 4-2 at 16). At this meeting, JRS also informed Vaughn Medical that it realized over $30 million per month in revenue from the sale of CPAPs and related products to the VA. *Id.*

Eventually, Vaughn Medical met with Respironics to discuss entering a distribution agreement. (Rec. Doc. 4-2 at 16-17). The prices reflected on the distribution agreement were higher than the prices Vaughn Medical was paying its third-party vendor. (Rec. Doc. 4-2 at 17). Vaughn Medical signed and executed the distribution agreement, and submitted it to the VA. *Id.* When the VA contacted Respironics to validate the agreement, Respironics informed the VA that it had rescinded the distribution contract with plaintiff, claiming that the terms of the agreement restricted plaintiff from selling Respironics CPAPs to the VA. *Id.* As a result of submitting this new agreement, Vaughn Medical unknowingly terminated its pre-existing Letter of Commitment with Sleep Management. *Id.* Furthermore, the VA refused to honor any third-party Letter of Commitment. *Id.*

Respironics and JRS then informed the VA that only JRS was permitted to sell Respironics CPAPs to the VA. (Rec. Doc. 4-2 at 18). The VA, however, refused to honor the defendants' position, but did implicitly reaffirm their preference for Respironics' CPAPs by discouraging individual VA medical centers from purchasing CPAPs from any company other than JRS. *Id.*

After a meeting with the Undersecretary of the VA, Vaughn Medical was informed that the VA would honor a Letter of Commitment from a third party vendor. (Rec. Doc. 4-2 at 19). The defendants then stepped up their efforts to exterminate

Vaughn Medical's supply lines. Representatives of JRS began to obtain serial numbers from Respironics' CPAPs at VA medical centers. *Id.* JRS then passed those numbers to Respironics, who could use them to track which third-party vendors were selling to Vaughn Medical. (Rec. Doc. 4-2 at 20). As a result of this activity, Respironics learned that Sleep Management was Vaughn Medical's sole source of supply. *Id.* Respironics contacted Sleep Management and encouraged the firm to cease its business with Vaughn Medical, which it eventually did. *Id.*

Vaughn Medical found additional third-party vendors from which to buy Respironics' CPAPs. *Id.* In response, JRS representatives continued to track serial numbers. *Id.* Respironics then informed all of its suppliers that they were not authorized to sell products to Vaughn Medical. (Rec. Doc. 4-2 at 20). Simultaneously, local representatives for JRS and Respironics began to disparage Vaughn Medical to individual VA medical centers. (Rec. Doc. 4-2 at 21). Respironics implemented an "Honesty, Ethics and Integrity Campaign," the purpose of which was to undermine Vaughn Medical's credibility. *Id.* Respironics and JRS once again informed the VA that only JRS was permitted to sell Respironics' CPAPs to the VA, (Rec. Doc. 4-2 at 22), and have falsified correspondence from the VA in an attempt to further tarnish the plaintiff's reputation. *Id.*

In the summer of 2009, the VA was informed that Respironics CPAP masks were manufactured in China, which was a clear violation of federal regulations. (Rec. Doc. 4-2 at 24). The VA then began to purchase these products from ResMed Corporation ("ResMed"). *Id.* ResMed also falsified correspondence from the VA to read that Vaughn Medical was not permitted to sell CPAPs and related products. (Rec. Doc. 4-2 at 25).

This correspondence was then shown to individuals at VA medical centers. *Id.* Additionally, ResMed terminated its contract with Sleep Management after learning that firm was selling the defendants' products to Vaughn Medical. (Rec. Doc. 4-2 at 26).

Plaintiff originally filed suit on August 24, 2009, in Jefferson County, Texas, alleging violations of Texas antitrust law, libel, slander, business disparagement, tortuous interference and other causes of action. (Rec. Doc. 14-1 at 2). On October 12, 2009, two individual defendants filed motions to transfer venue to Fort Bend County, Texas. *Id.* at 3. Plaintiff amended its petition twice while the Jefferson County state court considered the defendants' motions to transfer venue. *Id.* The Jefferson County state court ultimately concluded that the Fort Bend County state court was the proper venue for the case, and granted the individual defendants' motions to transfer. (Rec. Doc. 14-1 at 3).

Plaintiff filed the present suit in the Eastern District of Louisiana while the state case was pending in Fort Bend County, Texas. *Id.* After filing the present suit, the Plaintiff nonsuited its claims against all defendants in the Fort Bend County, Texas litigation. *Id.* Defendants JRS and Respironics retain pending counter-claims against the Plaintiff Vaughn Medical in the state court action. *Id.* Plaintiff sought to transfer venue of the state court case back to Jefferson County, Texas. That motion was denied. *Id.* Defendants subsequently filed these motions that are now before this Court.

**II. Law and Analysis**

A. *Motion to Dismiss for Improper Venue*

1. *Standard of Review*

Defendants, JRS, Respironics, and ResMed (collectively, "defendants") seek dismissal of the claims asserted by Plaintiff, Vaughn Medical, pursuant to Federal Rule of Civil Procedure 12(b)(3).

Federal Rule of Civil Procedure 12(b)(3) states that a party may move the court to dismiss the action for "improper venue." FED. R. CIV. P. 12(b)(3). Once a defendant has raised the improper venue issue by motion, the burden of sustaining venue rests with the plaintiff.[3] *Dupree v. Valero Energy Corp.*, 2003 WL 22466234 at *1 (E.D. La. 2003); *see also Corbello v. Devito*, 2008 WL 2097435 at *2 (E.D. Tex. 2008); *McCaskey v. Continental Airlines, Inc.*, 133 F. Supp. 2d 514, 523 (S.D. Tex. 2001). In the absence of an evidentiary hearing, a plaintiff may carry this burden by pleading facts that, if taken as true, establish proper venue. *McCaskey*, 133 F.Supp.2d at 523; *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994). The court accepts undisputed facts in the Plaintiff's pleadings as true, and resolves any conflicts in the Plaintiff's favor. *McCaskey*, 133 F.Supp.2d at 523.

2. *Analysis*

---

[3] The Court recognizes that the federal district courts in the Fifth Circuit have been inconsistent on the question of which party bears the burden of proof on a Rule 12(b)(3) Motion to Dismiss for improper venue. Some cases have held that the movant bears the burden to establish that venue is improper. *See, e.g., Texas Marine & Brokerage, Inc., v. Euton*, 120 F.Supp.2d 611, 612 (E.D. Tex. 2000) (stating that the burden to demonstrate that venue is improper lies with the movant); *Sanders v. Seal Fleet, Inc.*, 998 F. Supp. 729, 733 (E.D. Tex. 1998). "But 'the better view,' and the clear weight of authority, is that when an objection has been raised, the burden is on the plaintiff to establish that the district he chose is a proper venue." 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3826 (3d ed. 2010); *see, e.g., Terra Nova Sciences, LLC v. JOA Oil and Gas Houston*, 2010 WL 2671584 at *3 (S.D. Tex. 2010); *Psarros v. Avior Shipping, Inc.*, 192 F.Supp.2d 751, 753 (S.D. Tex. 2002).

Plaintiff asserts venue in the Eastern District of Louisiana under 15 U.S.C. § 22 is proper due to federal antitrust allegations against defendants.[4]  This statutory venue provision provides that "[A]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business." 15 U.S.C. § 22.

Taking the Plaintiff's allegations as true, the defendants' CPAPs and related products are distributed to VA hospitals in every district in the United States.  (Rec. Doc. 25 at 4).  Plaintiff also alleges that defendants JRS, Respironics, and ResMed all maintain a presence in Louisiana and have engaged in business transactions in Louisiana, thereby rendering this court a proper venue. (Rec. Doc. 4-2 at 3-4).

The test for "transacting business" within the meaning of 15 U.S.C. § 22 was set forth in *Eastman Kodak Company v. Southern Photo Materials Company*. 273 U.S. 359, 373 (1927).  In *Eastman Kodak*, the Court stated that "a corporation is engaged in transacting business in a district  . . . if, in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character." *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 373 (1927); *see United States v. Scophony Corp.*, 333 U.S. 795, 807 (1948); *see also National Athletic Trainers' Ass'n, Inc., v. American Physical Therapy Ass'n*, 2008 WL 4146022 at *11 (N.D. Tex. 2008) (stating that "a corporation transacts business . . . when a substantial business activity is performed within the jurisdiction with continuity of character, regularity, . . . and not looking toward

---

[4] In its complaint, Plaintiff did not plead 15 U.S.C. § 22 as grounds for venue in this court.  Plaintiff did so in its opposition to Defendants' 12(b)(3) motion to dismiss.  This Court may consider venue grounds that the plaintiff did not plead in its complaint to establish venue.  *Bro-Tech Corp. v. Purity Water Co. of San Antonio, Inc.*, 2008 WL 4326345 at *2 (W.D. Tex. 2008).

cessation of business.") (quoting *Daniel v. Am. Board of Emergency Med.*, 988 F.Supp. 127, 260 (W.D.N.Y. 1997). The *Eastman Kodak* decision effectively broadened the venue of the district courts in anti-trust suits. *Datamedia Computer Service, Inc. v. AVM Corp.*, 441 F.2d 604 (5th Cir. 1974).

With regard to the character of a corporation's business activity, numerous courts have discussed the test for substantiality in various contexts.[5] For example, in *Jeffrey-Nichols Motor Company v. Hupp Motor Car Corporation*, the United States Court of Appeals for the First Circuit explained that "while a single transaction of business may not be sufficient to establish venue in a district, it does not require the maintenance of an office or place of business or the presence of agents soliciting or taking orders." 46 F.2d 623, 625 (1st Cir. 1931). Nor is "the sale of goods essential to constitute transacting business. All the steps leading to or promoting sales may constitute the transaction of business." *Id.*

The defendants have neither challenged nor denied the Plaintiff's allegation that they have transacted business in this district within the meaning of 15 U.S.C. § 22. Instead, the defendants argue that Plaintiff has failed to illustrate any "reasonable relation" between its lawsuit and this district. There is no case law found in this district or otherwise to show a specific requirement for a "reasonable relation" between the

---

[5] The Fifth Circuit has addressed how to evaluate whether a corporation conducts business of a substantial character in the context of gross sales revenue. *See Green v. U.S. Chewing Gum Mfg. Co.*, 224 F.2d 369 (5th Cir. 1955). In *Green*, the Fifth Circuit reasoned that the test of substantiality is not one of percentages. *Id.* at 371-72. If it were, courts "would have different tests of substantiality applying to different corporations according to their size; a large corporation could, with impunity, engage in the same acts which would subject a smaller corporation to jurisdiction and venue." *Id.* Instead, the proper test is "whether or not the sales would appear to be substantial from the average businessman's point of view." *Id.*

lawsuit and the judicial district in which venue is sought under 15 U.S.C. § 22. The defendants argument is seemingly a response to a pleading deficiency under the general venue statute, *see* 28 U.S.C. § 1391(b), (c), and does not address the plaintiff's reliance on 15 U.S.C. § 22 to establish this court as a proper venue. Since venue is proper under the antitrust venue provision of 15 U.S.C. § 22, this court need not address the general venue statute.

Defendants' further allege that Plaintiff has engaged in forum shopping. Defendants cite to certain decisions that, they contend, support the proposition that dismissal under Rule 12(b)(3) is appropriate when a plaintiff engages in "improper forum shopping." (Rec. Doc. 14 at 4).

After a review of these decisions, this court finds that defendants mischaracterize the cases cited as support. In *King v. Russell*, plaintiff filed suit in the district court for the District of Arizona. 963 F.2d 1301 (9th Cir. 1992). In that case, plaintiff's choice of venue was reviewed under the general venue statute, 28 USC § 1391, and not 15 U.S.C. § 22. *Id.* at 1305-06. Furthermore, in *King*, the only connection of Arizona to the lawsuit was that the plaintiff was a resident of Arizona at the time the suit was filed. *Id.* at 1304. The district court, under its own discretion, chose to dismiss the case instead of transfer because "interests of justice" did not support a transfer to United States District Court for the Central District of California. *Id.* at 1304-05. The United States Court of Appeals for the Ninth Circuit explained that the district court did so because, "[the Plaintiff] expressed no interest in transfer and because 'of the fact that the action smacks of harassment and bad faith on the plaintiff's part in that it appears that she filed it here *after repeatedly losing on at least some similar claims in California.*'" *King*, 963 F.2d at 1304

(emphasis added). The court therefore issued a dismissal pursuant to 28 U.S.C. § 1406 based primarily on the fact that the plaintiff had already lost on several similar claims in previous litigation in California state courts; the court did not issue a 12(b)(3) dismissal based solely on improper forum shopping. *See id.* at 1304-05.

In this case, Plaintiff had not lost on any claims prior to filing its suit in this court. According to the defendants' memorandum in support for their 12(b)(3) motion to dismiss, the plaintiff filed this lawsuit in this court while the state court case was still pending. (Rec. Doc. 14-1 at 3). The merits of the state law claims had yet to be addressed or adjudicated by any Texas state court.

Defendants also cite *Wood v. Santa Barbara Chamber of Commerce Incorporated* as support to assert that dismissal is appropriate under Rule 12(b)(3) when a plaintiff engages in forum shopping. 705 F.2d 1515 (9th Cir. 1983). In *Wood*, the plaintiff originally filed a lawsuit against his employer in the district court for the Central District of California. *Wood v. McEwen*, 644 F.2d 797, 799 (9th Cir. 1981). After a United States magistrate dismissed his original lawsuit for abuse of discovery, Wood filed a second action claiming that the magistrate was fraudulently biased. *Id.* at 800. After losing his action against the magistrate, Wood shifted his original claims and redirected his litigation against over 250 defendants. *Id.* At one point, Wood had filed suits containing the same or similar claims in over 30 district courts. *Id.* Neither the district court's initial determination to dismiss Wood's case, nor the Ninth Circuit's affirmation of the district court's decision, was a 12(b)(3) dismissal for improper venue based on improper forum shopping. In the present case, the plaintiff's conduct is not indicative of an egregious exploitation of the Federal Rules of Civil Procedure, as was the case in both *King* and

*Wood*.  The defendants' attempt to analogize these cases with the procedural circumstances of this case is unwarranted.

Lastly, the defendants seek to limit the deference accorded to plaintiff's choice of forum by citing to a Second Circuit case, which stated "the sliding scale of deference tilts in favor of dismissal where the choice of forum is 'indicative of forum shopping.'" *Lasker v. UBS Securities, LLC*, 614 F. Supp. 2d 345, 358 (E.D.N.Y. 2008) (citing *Norex Petroleum Ltd. v. Access Indus. Inc.*, 416 F. 3d 146, 155 (2d Cir. 2005).  In reviewing *Lasker*, this Court disagrees with defendants' interpretation of that holding.

In *Lasker*, the defendants had filed a motion to dismiss based on the doctrine of forum non conveniens.  Forum non conveniens "permits a court, in its discretion, 'to resist the imposition upon its jurisdiction,' even though jurisdiction may be lawfully exercised and *venue is technically proper*, where the convenience of the parties and interests of justice favor trial in another forum." *Lasker,* 614 F. Supp. 2d at 358 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947) (emphasis added).  The statement cited by the defendants was offered by the *Lasker* court in the context of a three-step process used by the Second Circuit to guide the exercise of judicial discretion in applying the doctrine of forum non conveniens. *Id.* at 358.  Therefore, in *Lasker*, the court's reference to the diminished deference afforded a plaintiff's choice of forum was limited to the Second Circuit's forum non conveniens analysis, and is inapplicable to the instant litigation.

Since the defendants "transact business" within the meaning of the antitrust venue provision 15 U.S.C. §22, and the Eastern District of Louisiana may properly exercise subject matter jurisdiction over the claims and personal jurisdiction over the defendants,

venue is this court is proper. Defendants' motion to dismiss for improper venue is

DENIED. Because the Court holds, *infra*, that the Defendants' Motion to Dismiss should

be granted, it need not reach their Motion to Transfer pursuant to 28 U.S.C. § 1404(a),

which is now MOOT.[6]

B. *Motion to Dismiss for Failure to State a Claim*

1. *Plaintiff Has Failed to State Claim*

a. Standard of Review

Federal Rule of Civil Procedure 8(a) provides, in relevant part, that

[a] pleading that states a claim for relief must contain:
>    (1) a short and plain statement of the grounds for the court's jurisdiction, unless the
>    court already has jurisdiction and the claim needs no jurisdictional support; and
>    (2) a short and plain statement of the claim showing that the pleader is entitled to
>    relief; and
>    (3) a demand for the relief sought, which may include relief in the alternative or
>    different types of relief.

FED.R.CIV.P. 8(a)

Under Rule 8(a)(2), the statement need only "give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

While a complaint attacked by a Rule 12(b)(6) motion to dismiss need not contain

detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions; a formulaic recitation of

the elements of a cause of action will not suffice. *Twombly*, 550 U.S. at 555.

---

[6] To succeed in such a motion, the movant must "clearly demonstrate that the requested
transfer is '[f]or the convenience of the parties and witnesses, in the interest of justice.'"
*In re Volkswagen of America, Inc.*, 545 F.3d 304, 315 (5th Cir. 2008). It would be
neither efficient nor in the interests of justice for the Court to transfer a case which, on
the merits of a 12(b)(6) motion, should ultimately be dismissed.

To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 570). A plaintiff must do more than pleads facts that are "merely consistent with" a defendant's liability. *Id.* Facial plausibility exists when the facts pleaded permit the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* This is not to say that the plausibility standard is akin to a probability requirement, but it does ask for more than the sheer possibility that a defendant has acted unlawfully. *Id.*

Plausibility pleading calls for "enough fact to raise a reasonable expectation that discovery will reveal evidence of the [unlawful conduct]." *Twombly*, 550 U.S. at 556. Despite this reasonability requirement, the *Twombly* Court further explained that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* Thus, plausibility pleading still retains the primary function of serving notice to a defendant of the pending claims. The Supreme Court's mandate for contextualized factual assertions is critical to this notice function, since a complaint that relies on legal conclusions and bare assertions would leave a defendant "seeking to respond to plaintiffs' conclusory allegations . . . [with] little idea where to begin." *Twombly*, 550 U.S. at 565.

b. Antitrust Claims

    *i). Section 1 of the Sherman Act*

In the Fifth Circuit, to allege a violation of § 1 of the Sherman Act, a plaintiff must plead that (1) the defendants engaged in a conspiracy, (2) the conspiracy restrained trade, and (3) trade was restrained in the relevant market. *See Wampler v. Sw. Bell Tele.*

*Co.*, 597 F.3d 741, 744 (5th Cir. 2010) (citing *Apani S.W., Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 627 (5th Cir. 2002). Stating a claim under this provision requires a complaint with enough factual matter, taken as true, to suggest that an agreement was made. *Twombly*, 550 U.S. at 555. In addition to presenting contextualized facts to show an agreement or conspiracy, the plaintiff must also allege sufficient factual material to show the alleged agreement had an anticompetitive effect. *N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 358-363 (5th Cir. 2008).

Plaintiff alleges that Respironics and ResMed, pursuant to an illicit agreement among the defendants, refused to offer the products necessary to compete in the VA market to companies other than JRS. (Rec. Doc. 4-2 at 9-10, 18, 24-25). Plaintiff also contends that Respironics and JRS fixed minimum prices at which Respironics' products could be sold to the VA, (Rec. Doc. 4-2 at 13), and that they took numerous steps to staunch Vaughn Medical's third-party supply lines for defendants' products (Rec. Doc. 4-2 at 14, 19-21). Finally, the plaintiff asserts that the defendants falsified correspondence from the VA with the sole purpose of damaging Vaughn Medical's credibility, thereby eliminating opportunities to generate sales to VA medical centers. (Rec. Doc. 4-2 at 23-24). Taking the complaint's factual allegations as true, plaintiff has pleaded sufficient facts to state a claim under § 1. *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) ("The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.").

Defendants seek dismissal of plaintiff's section 1 claim based on a failure to plead anything more than conclusory allegations. For its section 1 claim, however, plaintiff is required only to plead a plausible claim of an illicit agreement to restrain trade. "Asking

for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 555. JRS and Respironics are not merely two companies against which random accusations of conspiracy have been levied. Defendants Respironics and JRS both admit to the existence of an intimate business relationship since 1985. (Rec. Doc. 18-1 at 2). Plaintiff has pleaded that the substantial financial benefits achieved from this relationship are derived from a mutually beneficial arrangement to artificially inflate prices charged to the VA. (Rec. Doc. 4-2 at 15). If JRS were to lose market share in the VA market, the profits of both JRS and Respironics would decline. (Rec. Doc. 4-2 at 16). ResMed enters the picture by allegedly agreeing to participate in efforts to use falsified documents to attack Vaughn Medical's reputation, and refusing to sell its products to Vaughn Medical for distribution to the VA. (Rec. Doc. 4-2 at 24-25). The Court finds that Vaughn Medical has alleged sufficient facts that, if proven, demonstrate that defendants conspired to engage in a pattern of exclusionary and anticompetitive conduct aimed at eliminating competition for the sale of Respironics' CPAPs and ResMed's CPAP masks to the VA. Plaintiff has therefore stated a plausible claim under § 1.

*ii). Section 2 of the Sherman Act*

Plaintiff has alleged that defendants have monopolized, attempted to monopolize, and conspired to monopolize the sale of CPAPs and related equipment to the VA. Each of these three allegations requires different measures of proof, and will be addressed in turn.

To state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must allege "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (quoting *United States v. Grinnel Corp.*, 384 U.S. 563, 570-71 (1966). Plaintiff has pleaded that JRS is the only company authorized to distribute Respironics CPAPs and ResMed CPAP masks to the VA. (Rec. Doc. 4-2 at 9-10, 16, 24-25). Thus, it possesses total control over the flow of these products to the VA. Plaintiff further alleges that JRS' market position was obtained pursuant to exclusivity agreements, and was maintained by improperly influencing the VA's purchasing decisions. (Rec. Doc. 4-2 at 13-16, 18). This is sufficient to state a claim of monopolization under § 2.

The elements of a claim based on *attempted* monopolization are (1) the specific intent to monopolize; (2) the use of predatory or anticompetitive tactics; and (3) the dangerous probability of success in monopolizing the relevant product and geographic markets. *Star Tobacco, Inc. v. Darileck*, 298 F.Supp.2d 436, 447-48 (E.D. Tex. 2003) (emphasis added). Plaintiff has pleaded that JRS derives monthly revenue of over $30 million from the sale of CPAPs and related devices to the VA, and that JRS intended to preserve this revenue stream by any means necessary. (Rec. Doc. 15-16). Plaintiff has also alleged that JRS representatives began visiting VA medical centers to obtain serial numbers off of Respironics CPAPs that had been sold to the VA by Vaughn Medical. The alleged purpose was to determine from where Vaughn Medical was obtaining the CPAPs and to cut off their supply lines. (Rec. Doc. 4-2 at 19-20). Taking well-pleaded

facts as true, plaintiff has shown that JRS intentionally engaged in anticompetitive tactics to secure its position of market dominance and exclude all other competitors from the national VA market for the sale of Respironics' CPAPs and ResMed's CPAP masks. (Rec. Doc. 4-2 at 13-16, 18, 19-20)

Further, to state a claim for *conspiracy* to monopolize, a plaintiff must allege (1) a specific intent to monopolize; (2) the existence of a combination or conspiracy; and (3) an overt act in furtherance of the conspiracy. *Stewart Glass & Mirror v. Auto Discount Ctrs., Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) (emphasis added). Plaintiff cites numerous instances that it alleges are illustrative of an elaborate conspiracy to exclude competition and monopolize the VA market. Plaintiff contends that the defendants undertook efforts to cut off Vaughn Medical's supply lines for Respironics' CPAPs. (Rec. Doc. 4-2 at 19-20). Plaintiff has also pleaded facts to demonstrate that the defendants unveiled an extensive smear campaign, dubbed the "Honesty, Ethics, and Integrity Campaign," intended to undermine Vaughn Medical's credibility to VA representatives. (Rec. Doc. 4-2 at 21). Finally, plaintiff alleges that representatives for the defendants have falsified certain documents in an attempt to damage Vaughn Medical's reputation. (Rec. Doc. 4-2 at 25). Here, plaintiff has satisfied the threshold pleading requirement by presenting facts to show that defendants conspired to undertake numerous anticompetitive measures intended to secure JRS position as the sole distributor of Respironics CPAPs and ResMed's CPAP masks to the VA.

### iii). Robinson-Patman Act

To state a claim under section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), a plaintiff must allege facts to demonstrate (1) "the defendant made at least two

contemporary sales of the same commodity at different prices to different purchasers and (2) the effect of such discrimination was to injure competition." *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 142 (3d Cir. 1998) (citing *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 219-27, 113 S.Ct. 2578 (1993)). "[T]o allege a violation of § [13(a)] one seller must have made two actual sales to two actual buyers at different prices." *Staton Holdings, Inc. v. Russell Athletic, Inc.*, 2009 WL 4016117 at *6 (N.D. Tex. 2009) (citing *L & L Oil Co. v. Murphy Oil Corp.*, 674 F.2d 1113, 1120 (5th Cir. 1982).

The Court finds that the plaintiff has not alleged that any discriminatory sales actually occurred. Plaintiff has alleged only the following: (1) Vaughn Medical has previously purchased CPAPs and related products from Respironics for patient-only distribution (Rec. Doc. 4-2 at 8); (2) because Respironics refused to sell its CPAPs to Vaughn Medical for distribution to the VA, Vaughn Medical was forced to purchase from a reseller for a higher price than that charged by Respironics to its vendors (Rec. Doc. 4-2 at 11); and (3) that Vaughn Medical subsequently entered into a second distribution agreement with Respironics which contained discriminatory pricing. (Rec. Doc. 4-2 at 17).

Regarding the first allegation, Vaughn Medical does not allege that the CPAPs purchased from Respironics for patient-only distribution were sold on discriminatory terms. While plaintiff does speculate that such discriminatory terms would exist today if Respironics did sell its CPAPs to Vaughn Medical, mere hypothetical transactions do not give rise to a claim under the Act.

As to the second allegation, Vaughn Medical actually bought Respironics' CPAPs through a reseller, not through Respironics itself. Plaintiff does not allege that this reseller suffered from discriminatory pricing terms. In fact, plaintiff explicitly alleges the typical arrangement between Respironics and all of its vendors operated according to the same or similar terms. (Rec. Doc. 4-2 at 11). Instead, Vaughn Medical asserts the price discrimination resulted from Respironics' refusal to sell its products to plaintiff. (Rec. Doc. 4-2 at 11). Vaughn Medical avers that, because it bought Respironics CPAPs through a reseller, it was forced to take a less favorable deal by incurring shipping costs, storage costs, and mark-up fees. (Rec. Doc. 4-2 at 11-12). Thus, any difference in pricing resulted not from Respironics' sale to Vaughn Medical on discriminatory terms, but from Respironics refusal to sell to Vaughn Medical. Such allegations, while potentially viable under other provisions of the federal antitrust laws, do not give rise to an actionable claim under the Robinson-Patman Act.

Plaintiff's final allegation involves a purported distribution agreement entered into by Respironics and Vaughn Medical. Plaintiff alleges the prices reflected in the agreement were significantly higher than those charged by Respironics to its other vendors. (Rec. Doc. 4-2 at 17). Notably, though, Vaughn Medical does not allege any actual sales took place pursuant to the alleged agreement. Merely *offering* different pricing to different customers does not state a claim for price discrimination under the Robinson-Patman Act. *See Stough v. May & Co. of Ga., Inc.*, 484 F.2d 22, 23 (5th Cir. 1973) ("[I]n order for there to be discrimination between purchasers, there must be actual sales at two different prices to two different actual buyers"); *see also Crossroads*, 159 F.3d at 142 ("Merely offering lower prices to a customer does not state a price

discrimination claim"); *Terry's Floor Fashions, Inc. v Burlington Indus.*, 763 F.2d 604,

615 (4th Cir. 1985) (noting that a failure to allege "two comparable, completed sales"

will defeat a claim under Section 2(a) of Robinson-Patman); *Fusco v. Xerox Corp.*, 676

F.2d 332, 337 (8th Cir. 1982).  Plaintiff's price discrimination claim brought under 15

U.S.C. § 13(a) is thus fatally flawed and must be DISMISSED.

2. *Failure to Allege Antitrust Injury*

a. Law

      Defendants also seek dismissal of plaintiff's antitrust claims on the grounds that

the plaintiff has not pleaded an antitrust injury. (Rec. Doc. 18-1 at 4-5).  Failure to plead

antitrust injury would preclude the plaintiff from establishing "antitrust standing."

Standing to pursue an antitrust suit requires a plaintiff to plead: 1) injury-in-fact—that is,

an injury proximately caused by the defendants' conduct; 2) antitrust injury; and 3)

proper plaintiff status, "which assures that other parties are not better situated to bring

suit." *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301,

305 (5th Cir. 1997); *see also Hydril Company, L.P., et al. v. Grant Pideco, L.P., et al.*,

2007 WL 1791663 (S.D. Tex. 2007).  In this case, the first and third elements are not in

dispute.

      Courts have made clear that antitrust injury is a predicate to antitrust standing.

*See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986) ("A

showing of antitrust injury is necessary . . . to establish standing under [the antitrust

laws]"; *T.O. Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1182 (5th Cir.1988) ("Proving

antitrust injury is a necessary requirement for proving standing; the former cannot stand

alone from the latter"); *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d

Cir. 1998) ("If antitrust injury is not found, further inquiry is unnecessary.").  As a threshold matter, the necessary antitrust injury is an injury attributable to the anticompetitive aspect of the practice under scrutiny. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884 (1990) ("Antitrust injury does not arise for purposes of [15 U.S.C. § 15] . . . until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct.").

b. Analysis

Defendants seek dismissal of plaintiff's antitrust claims on the grounds that the only injuries asserted by Plaintiff are those suffered in an individual capacity. (Rec. Doc. 18-1 at 4-5).  Specifically, defendants assert that the plaintiff cannot state an antitrust claim because it has not alleged facts to show a market-wide injury to competition. (Rec. Doc. 18-1 at 5).  In response, plaintiff contends that it has pleaded an antitrust injury. (Rec. Doc. 27 at 6-8).

The Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition. *See, e.g, Doctors' Hosp.*, 123 F.3d at 305; *Walker v. U-Haul Co.*, 747 F.2d 1011, 1016 (5th Cir. 1984); *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 986 n.6 (5th Cir. 1983).  Antitrust injury exists when (1) the injury was of the type antitrust laws were intended to prevent, and (2) that the injury "flows" or was caused by that which makes the defendant's conduct unlawful. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488-89 (1977).  Injury to competition, on the other hand, while often a necessary component to substantive liability, need not be pleaded for a plaintiff's antitrust claims to survive a motion to dismiss. *Doctor's Hosp.*, 123 F.3d at 305.  In this circuit, antitrust injury for standing purposes is viewed from the perspective of the

plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition. *Id.* Thus, to state a claim under the Sherman Act, a plaintiff, in addition to stating an antitrust violation, must allege facts sufficient to show antitrust injury. *In re Tamoxifen Antitrust Litigation*, 466 F.3d 187, 219 (2d Cir. 2006).

As support for its assertion that it has pleaded antitrust injury, plaintiff cites to the Fifth Circuit decision in *Norris v. Hearst Trust*. 500 F.3d 454 (5th Cir. 2007). Plaintiff's reading of *Norris* proposes that the antitrust injury requirement is met when an injury is inflicted on a business consumer or competitor of a defendant. (Rec. Doc. 27 at 7); *see Norris*, 500 F.3d 454 at 465-66. The plaintiff seeks recognition of its injuries as both a consumer of Respironics' and ResMed's products, and a competitor of Jordan Reses' distribution services. Under the plaintiff's suggested interpretation of *Norris*, such recognition would establish the requisite antitrust injury.

Such a reading of *Norris*, however, is inaccurate. It drastically oversimplifies the question of whether the defendants' activities resulted in antitrust injury. In that case, the Fifth Circuit was commenting less on the dynamics of anticompetitive conduct and more on which parties are most likely to bring suit under the federal antitrust laws. Thus, it was focused on the third element of the standing inquiry—the issue of whether the plaintiff is a proper party to an antitrust claim. *See Norris*, 500 F.3d at 466 (noting that consumers and competitors are the appropriate parties to bring antitrust claims because they are often the only parties injured by the harm to competition caused by antitrust violations). The Fifth Circuit was not stating a bright-line rule for gauging the occurrence of an antitrust injury. While it is typically consumers and competitors who

suffer as a result of calculated anticompetitive conduct,[7] this fact alone does not reflexively manifest an antitrust injury.

Nevertheless, Vaughn Medical's alleged losses and competitive disadvantage resulting from its exclusion from the VA market fall within the conceptual bounds of antitrust injury. Vaughn Medical is a would-be provider of CPAPs and related products to the VA and a direct competitor of JRS. Plaintiff alleges that JRS conspired with manufacturers Respironics and ResMed to deprive Vaughn Medical and other competitors of the opportunity to actively compete in the VA market. (Rec. Doc. 4-2 at 26). Plaintiff further alleges that the defendant JRS exploited its market power in the VA market to weaken Vaughn Medical as a competitor. (Rec. Doc. 27 at 10). Plaintiff also asserts that Respironics and ResMed sold their products to JRS at a price lower than that charged to its competitors. (Rec. Doc. 4-2 at 28). These are the types of injuries that the antitrust laws were intended to prevent. And since Vaughn Medical has pleaded that its purported injuries flow directly from the defendants' allegedly exclusionary conduct, the second prong of the antitrust injury analysis is also satisfied. See *Brunswick Corp.,* 429 U.S. at 488-89. Thus, Vaughn Medical has adequately alleged antitrust injury.

3. *Failure to Plead a Relevant Market*

Defendants seek dismissal of plaintiff's section 1 and section 2 claims for failure to plead a relevant market. (Rec. Doc. 18-1 at 6). In response, the plaintiff asserts that the

---

[7] It is important to note that customers and competitors do not automatically have antitrust standing. The plaintiff's opposition brief focuses mainly on the fact that, as both a consumer and a competitor, it has suffered antitrust injury and should therefore have antitrust standing. Such an assertion oversimplifies the antitrust standing analysis. *See Atl. Richfield*, 495 U.S. at 338; *accord Cargill*, 479 U.S. at 122; Brunswick, 429 U.S. at 488; *see also Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310-314 (4th Cir. 2007) (declining to adopt a bright line rule that only consumers and competitors have antitrust standing).

defendants actions were *per se* unlawful under the Sherman Act and, as a result, it need not plead a relevant market. (Rec. Doc. 27 at 8-9). In the alternative, plaintiff avers that it has adequately alleged a relevant market. (Rec. Doc. 27 at 10-12). To determine if the plaintiff is required to plead a relevant market, the Court must first establish whether the defendants' alleged anticompetitive activities are *per se* unlawful, or if they should be analyzed under the rule of reason. *Apani*, 300 F.3d at 627; *Blanchard & Co. v. Barrick Gold Corp.*, 2003 WL 22071173 at *7 (E.D. La. 2003).

a. *Per se* or Rule of Reason?

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states . . . is declared to be illegal." 15 U.S.C. § 1. Though on its face § 1 creates only a criminal penalty, § 4 of the Clayton Act, 15 U.S.C. § 15(a), provides treble damages relief to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." While this language is seemingly broad, the Supreme Court has construed this provision to afford a remedy to only those victims of "unreasonable" restraints of trade. *See Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988); 15 U.S.C. § 1.

Ordinarily, alleged violations of § 1 of the Sherman Act undergo the rule of reason analysis. *See Khan*, 522 U.S. at 10; *Bus. Elecs.*, 485 U.S. at 723. In the Fifth Circuit, "[p]roof that the defendant's activities . . . adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of

reason." *Apani*, 300 F.3d at 627 (citing *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1392 (5th Cir. 1983)).

However, if the restraint alleged is among that small class of actions that courts have deemed to have "such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit," it will be considered *per se* unreasonable. *Khan*, 522 U.S. at 10; *see also Jayco Sys., Inc. v. Savin Bus. Mach. Corp.*, 777 F.2d 306, 317 (5th Cir. 1985) (explaining that certain business practices have such an inherently detrimental effect on competition that they are presumed facially unreasonable and therefore illegal). *Per se* liability is reserved for only those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher*, 547 U.S. at 5 (quoting *National Soc. of Professional Engineers v. U.S.*, 435 U.S. 679, 692 (1978)). In other words, if the plaintiff's factual allegations create an inference that the defendants' activities were *per se* unlawful, the requirement to plead a relevant market is lifted, as the anticompetitive effects of defendants' activities are considered facially apparent. *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir. 1997).

Plaintiff alleges harm suffered as a result of numerous anticompetitive acts committed by the defendants and asserts a remedy is warranted under § 1. These acts include exclusive dealing arrangements, group boycotts, and price fixing. *Per se* liability has been applied to certain incarnations of these particular business practices. *See Jayco*, 777 F.2d at 317; *see also U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) (price fixing); *Klors, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)(group boycotts). Importantly, though, none of these practices receives blanket application of *per se*

treatment. Instead, each requires the presence of certain specific characteristics to trigger *per se* liability under the antitrust laws. Specifically, the Court must ascertain whether the alleged anticompetitive acts were the result of a horizontal agreement, from which flows *per se* liability, or whether they stem from a vertical agreement, which generally implicates the rule of reason.[8] *Jayco*, 777 F.2d at 317; *see also Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004 (5th Cir. 1981).

b. Horizontal or Vertical Agreements?

"Whether or not a combination or conspiracy falls under the *per se* rule often depends upon whether the restriction is implemented by a vertical or horizontal agreement." *Jayco*, 777 F.2d at 317; *see also Red Diamond*, 637 F.2d at 1004. Horizontal combinations are agreements among competitors that restrain competition among enterprises at the same level of distribution.[9] *Bus. Elecs.*, 485 U.S. at 730. These are generally considered facially unreasonable and are therefore illegal *per se*. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir. 1981).

Vertical restraints are those "imposed by persons or firms further up the distribution chain of a specific product (or in rare cases, further down the chain) than the

---

[8] As explained infra, "[r]estraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs.*, 485 U.S. at 730.

[9] They affect *inter*brand competition, which is considered to be the "primary concern of antitrust law." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n.19, 97 S.Ct. 2561 (1977) (emphasis added). Interbrand competition is the competition among the manufacturers of the same product.[9] *Ibid.*

enterprise restrained."[10]  *Muenster*, 651 F.2d at 295.  The courts have concluded that a vertical restraint is unreasonable when its probable anticompetitive effects outweigh any procompetitive benefits. *Viazis v. American Ass'n of Orthodontists*, 314 F.3d 758, 765 (5th Cir. 2002); *see also Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342 (1990).

Here, plaintiff alleges that defendants conspired to commit numerous anticompetitive acts, ultimately depriving it of the right to distribute Respironics' CPAPs and ResMed CPAP masks to VA medical centers.  Plaintiff's allegations, however, do not embody the requisite characteristics of horizontal restraints to which *per se* liability would attach.  A vast majority of the alleged anticompetitive acts are the result of purported agreements between manufacturers and a distributor.  These are vertical in nature, since the parties operate on separate levels of distribution. *See Muenster*, 651 F.2d at 295.  Below, the Court will more fully explain the vertical character of each of the plaintiff's specific antitrust theories.

*i). Group Boycott*

The Supreme Court has defined group boycotts as "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *N.W. Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 294, 105 S.Ct. 2613 (1985).  A group boycott, or concerted refusal to deal, can be a violation of section 1 of the Sherman Act. *Tunica Web Adv. v. Tunica Casino Operators*

---

[10] They generally affect *intra*brand competition and are analyzed under the rule of reason. *Continental T.V.*, 433 U.S. at 52 n.19, 97 S.Ct. at 2558 (emphasis added). Intrabrand competition exists between the distributors of the product of a particular manufacturer. *Ibid.*

*Ass'n, Inc.*, 496 F.3d 403, 412 (5th Cir. 2007). Depending on the factual circumstances, group boycotts may be either unlawful *per se* or subject to the rule of reason. *Id.*

The Supreme Court has clarified that a necessary predicate for a *per se* group boycott is that it is horizontal, i.e., it must involve an agreement among enterprises that ordinarily compete with each other at the same level of the market. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, 119 S.Ct. 493 (1998) ("[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors"); *see also Bus. Elecs.*, 485 U.S. at 723 ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints[.]"). Moreover, the *per se* approach is generally limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *F.T.C. v. Indiana Fed. of Dentists*, 476 U.S. 447, 458 (1986).

Therefore, to plead a *per se* group boycott, the plaintiff must allege facts to demonstrate that the concerted anticompetitive activity involved two or more competitors positioned at the same market level with each other. Plaintiff argues that it need only plead that JRS has conspired with Respironics and ResMed to make it more difficult for Vaughn Medical to obtain the products it needs to conduct business with the VA. (Rec. Doc. 27 at 13). In response, defendants point to plaintiff's failure to present facts alleging that JRS possesses the requisite market power to coerce or influence the VA from conducting business with Vaughn Medical. (Rec. Doc. 18-1 at 10). Defendants also argue that the boycott alleged by plaintiff is a vertical restraint, as plaintiffs have not asserted that the alleged agreement was between at least two competitors at the same market level. (Rec. Doc. 18-1 at 10).

To begin, of the defendants, JRS is the plaintiff's only competitor. Plaintiff has not alleged that JRS conspired horizontally with another competitor in an attempt to discourage the VA from doing business with Vaughn Medical. Based on the allegations in the complaint, the plaintiff is incapable of making such an assertion since there is no CPAP distributor other than JRS who would benefit from the facts underlying the present dispute. Furthermore, while the plaintiff has pleaded that both Respironics and ResMed are privy to the alleged conspiracy, it has not alleged that they have conspired in their capacity as competitors. Both companies manufacture and sell CPAPs, but only Respironics sells their CPAPs to the VA. These firms do not actively compete for the sale of CPAPs to the VA market. Nor has plaintiff alleged that Respironics and ResMed made threats to the VA to withhold their products if the VA continued to conduct business with Vaughn Medical.

The Court reads the complaint to allege two separate vertical agreements; the first between Respironics and JRS for the distribution of CPAPs; and the second between ResMed and JRS for the distribution of CPAP masks. Group boycotts that are vertical in nature must be examined under the rule of reason standard, since, although competition among distributors is reduced, competition of manufacturers may be promoted by allowing them to achieve certain efficiencies in the distribution of their products. *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d, 126, 131 (2d Cir. 1978). Plaintiff's contention that the defendants' alleged group boycott is *per se* unlawful is therefore incorrect. The rule of reason is the appropriate barometer with which to gauge the defendants' alleged anticompetitive activities.

*ii). Price-Fixing*

Plaintiff alleges that Respironics and JRS conspired to fix prices at which CPAPs were sold to the VA. (Rec. Doc. 4-2 at 13, 15). Specifically, plaintiff argues that Respironics and JRS conspired to establish a minimum resale price at which distributors could sell Respironics' CPAPs to the VA.[11] (Rec. Doc. 4-2 at 13, 15). The Courts have stated that only horizontal price-fixing agreements are *per se* unlawful. *See, e.g, Dagher*, 547 U.S. at 5; *North Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 362 (5th Cir. 2008) (noting that only horizontal price fixing agreements are generally deemed *per se* violations); *Elliot Indust. Ltd. Partnership v. BP America Prod. Co.*, 407 F.3d 1091, 1123 n.29 (10th Cir. 2005) (claim of horizontal price fixing requires conspiracy "among actual competitors (i.e. at the same level of distribution)"). Horizontal price fixing has been defined as "an arrangement among competitors that interferes with the setting of prices by free market forces." *Quest Exploration & Dev. Co. v. Transco Energy Co.*, 1992 WL 682756 at *6 (S.D. Tex. 1992) (citing *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 614 (1953). To plead a claim of horizontal price-fixing, the plaintiff must allege facts to show the existence of an agreement or conspiracy among actual competitors, with the purpose or effect of depressing, fixing, or stabilizing the price of a commodity in interstate commerce. *United States v. Socony-Vacuum Oil Co.*, 310 U.S.150, 216-19 (1940). The complaint, however, does not plead this species of price-fixing.

Vertical price-fixing occurs when two firms in a distribution chain establish price ranges of goods or services. *Socony-Vacuum*, 310 U.S. at 222-23. Plaintiff alleges that

---

[11] This type of activity is also referred to as resale price maintenance, which, when conducted in the manner alleged, is a vertical restraint. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 890, 127 S.Ct. 2705, 2715 (2007).

Respironics and JRS conspired to fix minimum prices at which Respironics' brand CPAPs were sold to the VA. The alleged agreement involves only a manufacturer and a distributor, two parties that undoubtedly operate at different market levels. As a result, this type of alleged price-fixing agreement is vertical in nature. While vertical price-fixing agreements were previously held to be *per se* unlawful under the antitrust laws, the Supreme Court recently changed its position. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 890, 127 S.Ct. 2705, 2715 (2007). Vertical price-fixing is now evaluated under the rule of reason.[12] *Id.*

### iii). Exclusive Dealing

Exclusive dealing occurs "when a seller agrees to sell its output of a commodity to a particular buyer." *Apani*, 300 F.3d at 625 (citing WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK § 4.02[3] (1999)). Plaintiff argues that both Respironics and ResMed violated section 1 through exclusive agreements with JRS for the distribution of their products to the VA. Defendants point out that "exclusive dealing arrangements are presumptively legal," and the policing of a valid distribution agreement is not an actionable violation of section 1. (Rec. Doc. 18-1 at 8); *see E& L Consulting, Ltd. v. Doman Indus., Ltd.*, 472 F.3d 23, 29-30 (2d Cir. 2006) (stating that an exclusive distributorship agreement, standing alone, is not illegal).

Exclusive dealing agreements can be attacked under the rule of reason, but are not *per se* violations of the antitrust laws. *Eastern Food Servs., Inc. v. Pontifical Catholic University*, 357 F.3d 1, 4-5 (1st Cir. 2004); *see also A.H. Cox & Co. v. Star Machinery*

---

[12] Horizontal price-fixing remains unlawful *per se* under the antitrust laws. *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 315 (2d Cir. 2008) (citing *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 102 S.Ct. 2466 (1982)).

*Co.*, 653 F.2d 1302, 1306 (9th Cir. 1981) (stating that exclusive manufacturer dealer arrangements are generally viewed as vertical in nature, thus rendering the *per se* rule of illegality inapplicable). This is because the focus of the analysis remains on market effect. *George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 140 n.1 (2d Cir. 1998). An exclusive dealing arrangement does not violate the antitrust laws "unless the probable effect of the agreement 'will foreclose competition in a substantial share of the line of commerce affected.'" *Apani*, 300 F.3d at 625 (citing *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir. 1981)).

To properly allege that an exclusive dealing agreement violates the Sherman Act, a plaintiff must first define the relevant market in terms of its product and geography. *Apani*, 300 F.3d at 625 (citing *Tampa Elec.*, 365 U.S. at 327-28, 81 S.Ct. 623). A plaintiff must then plead facts to demonstrate that the "competition foreclosed by the arrangement constitutes 'a substantial share of the relevant market.'" *Apani*, 300 F.3d at 625-26 (explaining that "in order to determine whether a substantial portion of the competition has been foreclosed, [plaintiff] must first identify the relevant product and geographic markets"). Thus, because exclusive dealing agreements are analyzed under the rule of reason, pleading a relevant market is a necessary predicate to examining the agreement's anticompetitive impact.

### iv). An Exception

While vertical restraints typically undergo a rule of reason analysis, there are limited exceptions to the horizontal / vertical dichotomy. The only exception applicable to the facts of this case is when a supplier, "although acting vertically, refuses to deal with . . . a customer at the behest of the customer's competitor." *Jayco*, 777 F.2d at 317-

18. Although the result is, itself, a vertical restraint, "the desired impact is horizontal and on the dealer, not the manufacturer, level." *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 168 (3d Cir. 1979).

To qualify for this exception, JRS must be the source of the alleged restraint, because, of the defendants, JRS is plaintiff's only competitor. *See Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422, 427 n.5 (5th Cir. 1981); *see also Red Diamond*, 637 F.2d at 1004 n.4 (stating that "conspiracies between a manufacturer and its distributors are only treated as horizontal . . . when the source of the conspiracy is a combination of the distributors."). With regard to Respironics, plaintiff asserts that JRS had "strong influence at Respironics." (Rec. Doc. 4-2 at 14). Taken as true, this statement does not give rise to an inference that JRS was the source of Respironics' decision to limit Vaughn Medical to patient-only distribution rights. If anything, the facts pleaded suggest that the defendant manufacturer Respironics acted independently when it denied Vaughn Medical the right to distribute its products to the VA. (Rec. Doc. 4-2 at 9). As a result, the agreement between Respironics and JRS must be evaluated using the rule of reason. *See Red Diamond*, 637 F.2d at 1004 ("When the manufacturer is the source, the conspiracy is vertical.") (citing *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 372, 87 S.Ct. 1856 (1967).

ResMed's involvement in the alleged conspiracy, though, warrants closer scrutiny. Plaintiff proposes that JRS may have initiated an arrangement that granted ResMed access to the VA market, provided that JRS was the only firm allowed to distribute its CPAP masks to the VA. (Rec. Doc. 4-2 at 24). Aside from the conclusory nature of this allegation, the plaintiff overlooks one key feature of this exception. The

exception is activated only by a concerted refusal to deal. Here, the complaint paints the

picture of an exclusive distribution agreement between ResMed and JRS. The complaint

suggests only that ResMed will not allow Vaughn Medical to distribute its CPAP masks

to the VA. However, ResMed also manufactures CPAPs. The facts alleged do not

permit the Court to reasonably infer that ResMed will not allow Vaughn Medical to

distribute its products to other clients on the open market. It is difficult to rationalize

how any alleged agreement between JRS and ResMed could be *per se* illegal, as plaintiff

suggests, if Vaughn Medical retains the ability to distribute ResMed's products to clients

other than VA. The Court finds this exception inapplicable to the facts of this case.

Plaintiff has not pleaded facts to demonstrate ResMed's blanket refusal to deal with

Vaughn Medical. Consequently, the rule of reason applies to all of plaintiff's section 1

claims.

c. Relevant Market Allegations

Under section 1 of the Sherman Act, a relevant market must be pleaded for the

Court to assess any anticompetitive effects in a rule of reason analysis. *Muenster*, 651

F.2d at 295. The definition of a relevant market is "a function of the relevant product

market and the relevant geographic market." *Wampler v. S.W. Bell Tel. Co.*, 597 F.3d

741, 744 (5th Cir. 2010); *see also Apani*, 300 F.3d at 627 (citing *Spectators',* 253 F.3d at

220). A relevant product market includes the line of goods or services reasonably

interchangeable in use. *U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 396, 76

S.Ct. 994 (1956). The relevant geographic market is "the area of effective competition . .

. in which the seller operates, and to which the purchaser can practically turn for

supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623 (1961).

The Court recognizes that market definition is a deeply fact-intensive inquiry that generally cannot be resolved at the motion to dismiss stage. *See Seidenstein*, 769 F.2d at 1106. However, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Apani*, 300 F.3d at 628.

### i). Product Market

The boundaries of a product market are determined by the reasonable interchangeability of use and "the degree of cross-elasticity of demand between the product and substitutes for it." *Apani*, 300 F.3d at 626. "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (internal quotation and citation omitted). Cross-elasticity of demand measures the substitutability of those products from viewpoint of the buyers.[13] *Id.* at 438 n.6.

Defendants read the complaint to imply that the product market is the sale of Respironics' CPAPs to VA medical centers. (Rec. Doc. 18-1 at 6-7). In its opposition brief, the plaintiff disputes such a reading, insisting that the alleged product market

---

[13] Cross-elasticity of demand is defined as "[a] relationship between two products, usually substitutes for each other, in which a price change for one product affects the price of the other." BLACK'S LAW DICTONARY 405 (8th ed. 2004).

includes all CPAPs. (Rec. Doc. 27 at 12). The facts alleged in the complaint, however, wholly contradict such an assertion. Nowhere does plaintiff assert that JRS distributes any CPAPs other than Respironics' CPAPs. (Rec. Doc. 27 at 11). Nor does the plaintiff mention any CPAP manufacturer other than the defendants Respironics and ResMed. In reference to its section 1 claim, all of the plaintiff's allegations of anticompetitive activities are made solely in reference to their ability to resell Respironics brand CPAPs. (Rec. Doc. 4-2 at 26-29). This deficiency is critical because courts have generally held that a single brand, no matter how distinctive or unique, and no matter how intense the brand loyalty, cannot constitute a relevant market.[14] *See PSKS, Inc., v. Leegin Creative Leather Prods.*, 2009 WL 938561 at *2 (E.D. Tex. 2009) (citations omitted); *see also Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672-73 (7th Cir. 1985); *General Business Sys. v. North American Phillips Corp.*, 699 F.2d 965, 972-75, 977-78 (9th Cir. 1983); *Little Caesar Enters., Inc. v. Smith*, 34 F.Supp.2d 459, 477 n.30 (E.D. Mich. 1998).

  More importantly, the complaint is entirely devoid of any allegations that CPAPs manufactured and sold to the VA are not reasonably interchangeable with CPAPs sold to

---

[14] While it is true that "antitrust law recognizes . . . economically significant submarkets . . . which themselves constitute relevant product markets," plaintiff has not alleged that the Respironics CPAPs constitute a unique submarket that should be considered separately for antitrust purposes. *Leegin*, 2009 WL 938561 at *3 (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487-88 (5th Cir. 1984). "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Apani*, 300 F.3d at 626 (citing *Heatransfer Corp. v. Volkswagenwerk, A. G.,* 553 F.2d 964, 980 (5th Cir.1977)). Even if this assertion were made, Respironics' CPAPs are not a viable submarket, since "a submarket is still a market" and "a single brand cannot be its own market." *Leegin*, 2009 WL 938561 at *3.

individuals, sleep centers, or other government entities, for example.  Nothing in the record would suggest that the CPAPs sold to the VA are unique or functionally distinguishable from other CPAPs.  Yet plaintiff makes no mention of interchangeable substitute products.  Plaintiff asserts only that the VA prefers Respironics' CPAPs to those of other distributors.  While this may be the case, a separate product market cannot be established by a single customer's preference for a particular manufacturer of a particular device. *See Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("The consumers do not define the boundaries of the market, the products or producers do.").  Nor may a company that "limits its competitive activities to a single firm's products (and at only one competitive level) . . . control the definition of the relevant market." *Spectrofuge Corp., v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978) (citing *Telex Corp. v. Int'l Bus. Mach. Corp.*, 510 F.2d 894, 917 (10th Cir. 1975).  As the plaintiff has wholly neglected to reference the rule of reasonable interchangeability, its proposed product market of Respironics CPAPs is legally unsustainable.  When such a deficiency is present, a motion to dismiss may be granted. *See Apani*, 300 F.3d at 628; *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997) (affirming district court's dismissal of claim for failure to plead relevant market; proposed relevant market defined too narrowly); *TV Comms. Net., Inc. v. Turner Net. Telev., Inc.,* 964 F.2d 1022, 1025 (10th Cir.1992) (affirming district courts dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); *Tower Air, Inc. v. Federal Exp. Corp.,* 956 F.Supp. 270 (E.D.N.Y.1996) ("Because a relevant market includes all products that are reasonably interchangeable, plaintiff's failure to define its

market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.").  Furthermore, because the entire foundation of plaintiff's antitrust claims is constructed only of its inability to distribute Respironics' CPAPs to the VA, the Court finds that plaintiff is incapable of successfully asserting the existence of any legally sufficient product market.  As a result of this finding, the plaintiff's section 1 claims are irreversibly flawed.[15]  Plaintiff's section 1 claims are therefore DISMISSED.

d. Section 2 of the Sherman Act

Section 2 provides a cause of action against "single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports v. McQuillan*, 506 U.S. at 447, 454, 113 S.Ct. 884 (1993).  Monopoly power is understood as "the power to control price or exclude competition" from the relevant market. *E.I. duPont de Nemours*, 351 U.S. at 391.  Plaintiff alleges that defendants have monopolized, attempted to monopolize, and conspired to monopolize the sale of CPAPs and CPAP-related products to the VA.  Defendants respond that plaintiff's § 2 claims should be dismissed for failure to plead a relevant market. (Rec. Doc. 18-1 at 12-14).

The Fifth Circuit has held that "[b]ecause the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement under § 2 [of the Sherman Act]." *Seidenstein v. National Med. Enters., Inc.*, 769 F.2d 1100, 1106 (5th Cir. 1985); *see also Doctor's Hosp.*, 123 F.3d at 311.  For the reasons stated in the previous section, plaintiff

---

[15] Due to the Court's finding that the plaintiff is wholly incapable of defining a relevant product market in support of its antitrust claims, the Court need not address the sufficiency of plaintiff's proposed geographic market.

has failed to plead a relevant product market from which the anticompetitive effects of defendants' conduct can be measured.

e. Anticompetitive Effect

Market considerations provide the objective benchmark for the measurement of competitive impact. *Continental T.V.*, 433 U.S. at 54. Competitive injury cannot be ascertained without first defining the relevant market. *Apani*, 300 F.3d at 627 (noting that the relevant market must be identified before a court may determine whether an alleged anticompetitive arrangement foreclosed competition). In this case, the absence of a legally cognizable market precludes the Court from assessing the anticompetitive effect of defendant's alleged activities. *See Leegin*, 2009 WL 938561 at *5 (commenting that when a plaintiff fails to define a relevant market, the court is left without a means to gauge anticompetitive effect.). Plaintiff's section 2 claims are also DISMISSED.

4. *Civil Rights Claims*

The complaint asserts that the defendants have acted individually and in concert, combination, and conspiracy to impede Vaughn Medical's right to make and enforce contracts and its right to buy, sell, and hold property in violation of 42 U.S.C. §§ 1981, 1982, 1985. (Rec. Doc. 4-2 at 29). To establish a prima facie claim under § 1981, the plaintiff must allege facts to support the following three elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by defendants; (3) the discrimination concerns one or more of the activities enumerated in the statute.[16] *Green v. State Bar of Tex.*, 27 F.3d 1083, 1086 (5th Cir. 1994). The

_____

[16] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons

"enumerated activity" implicated in this case is the right to "make and enforce contracts."

A § 1982 claim requires the plaintiff to "allege with specificity facts sufficient to show or raise a plausible inference of (1) the defendant's racial animus; (2) intentional discrimination; and (3) that the defendant deprived plaintiff of his rights [to buy, sell, and hold property] because of race."[17] *Zuyus v. Hilton Riverside, et al.*, 439 F.Supp.2d 631, 636 (E.D. La. 2006) (citing *Brown v. Philip Morris, Inc.*, 250 F.3d 787, 797 (3d Cir. 2001).

The conspiracy claim under § 1985(3) requires the plaintiff to plead (1) the existence of a conspiracy; (2) the purpose of the conspiracy was to deprive, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) a resulting injury in the plaintiff's person or property or the deprivation of a right or privilege of a citizen. *See Mian v. Donaldson, Lufkin, and Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *see also United Brotherhood of Carpenters and Joiners of America et al. v. Scott*, 463 U.S. 825, 828-29, 103 S.Ct. 3352 (1983). Additionally, a §1985(3) claim requires a plaintiff to allege "that (1) some racial (or otherwise class-based, invidiously discriminatory) animus" underlie the conspirators' action; and (2) that the conspiracy "aimed at interfering with federal right that are protected against private, as well as official, encroachment." *Zuyus*, 439 F.Supp.2d at 637 (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268, 113 S.Ct. 753 (1993). To

---

and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981

[17] Section 1982 provides that all U.S. citizens have the same right as white citizens to purchase real or personal property. 42 U.S.C. § 1982.

guarantee the survival of each of these claims at the motion to dismiss stage, the complaint must plead facts sufficient to support an inference that the defendants intended to discriminate against the plaintiff on the basis of race.

The defendants advance numerous reasons why plaintiff's civil rights claims should be dismissed. It is unnecessary, however, for the Court to expound on the virtues of each argument. Although replete with conclusory allegations of racial animus, the complaint is bereft of any contextualized factual assertions from which to infer the defendants' activities were ultimately driven by discriminatory intent. This deficiency is fatal to plaintiff's civil rights claims.

The plaintiff's civil rights claims rely heavily on Exhibit A, also referred to as the Whistleblower Letter. In that letter, an anonymous source alleged that members of the VA's Product Team Committee made discriminatory remarks about Vaughn Medical and other minority-owned companies. (Rec. Doc. 4-2, Ex. A). Defendants rely on Federal Rule of Civil Procedure 10(a) when arguing that the exhibit is not a proper attachment since it does not give rise to the claims asserted. (Rec. Doc. 18-1 at 17-18).

The plaintiff refers to Exhibit A when asserting that Respironics and JRS referred to Vaughn Medical and two other companies as "ni**er companies." (Rec. Doc. 4-2 at 19). Exhibit A, however, does not lend support to this assertion. As the exhibit shows, the statement was made not by an employee of Respironics or JRS, but by an employee of the VA. Even if the defendants were aware that these statements were made, such racial animus would only be relevant as it pertains to decisions reached by the VA. Here, the Court will not impute the alleged racial animus of one VA employee to the defendant corporations. As the exhibit does not give rise to the legal rights asserted here by

plaintiff under 42 U.S.C. §§ 1981, 1982, and 1985, the Court will not consider its content.[18]

Turning to the complaint, a brief review of the allegations contained therein clearly illustrates the formulaic character of plaintiff's claims of discrimination. The plaintiff makes the following assertions: that defendants "improperly exerted pressure on the VA to coerce it into its erroneous decision that Vaughn Medical was not authorized to do business with the VA," and that these efforts were partially based "on the fact that Vaughn Medical was a minority-run business" (Rec. Doc. 4-2 at 11-12, 18); that defendants Respironics and JRS were motivated by racial animus when they conspired to prevent Vaughn Medical from competing in the sale of Respironics' brand CPAPs to the VA (Rec. Doc. 4-2 at 13); that defendant Respironics' refusal to warrant Respironics brand CPAPs sold to the VA by Vaughn Medical was motivated by racial animus (Rec. Doc. 4-2 at 15); that JRS was able to exploit its non-minority owned status to the detriment of Vaughn Medical and other so-called "ni**er companies" (Rec. Doc. 4-2 at 19); that the defendants' efforts to undermine the credibility of Vaughn Medical to VA medical centers throughout the country were motivated, at least partially, by racial animus (Rec. Doc. 4-2 at 21); that the defendants' representatives were motivated by racial animus when they created and showed falsified correspondence to individual VA medical centers in an attempt to further diminish Vaughn Medical's reputation (Rec. Doc. 4-2 at 23). But the plaintiff has failed to provide any facts that, when taken in context,

---

[18] *See Walker v. S.W.I.F.T. SCRL*, 517 F.Supp.2d 801, 806 (E.D. Va. 2007) (noting that, when evaluating a dismissal motion, not every document referenced in the complaint can be considered a part of the complaint; the referenced document must be "central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted.").

would indicate that any of the defendants' activities were in fact driven by racial animosity.

One illustration of the contradictory character of the allegations of racial animus is as follows.  Plaintiff pleads that it was a customer to Respironics prior to seeking entry to the VA market. (Rec. Doc. 4-2 at 8).  Plaintiff asserts that defendant would still be selling its products to Vaughn Medical today had plaintiff never decided to enter the VA market. (Rec. Doc. 4-2 at 8).  Specifically, the complaint alleges that, although the defendant refused to provide the necessary "Letter of Commitment" to conduct business with the VA, Respironics remained willing to sell its products to Vaughn Medical for any purpose other than resale to the VA. (Rec. Doc. 4-2 at 9).  Taken as a whole, the allegations are seemingly meant to suggest that Respironics' refusal to grant distribution rights to the plaintiff for its CPAPs is racially motivated only when the buyer is VA medical centers.  Notably absent are any facts to explain this distinction.  Also missing is any explanation of why plaintiff's efforts to pursue the VA market arbitrarily prompted sentiments of racial animosity among the defendants, or how such sentiments actually drove their policy of exclusion.  As a result, the plaintiff's assertions amount to nothing more than mere conclusions. *See Twombly*, 550 U.S. at 555.

Pursuant to *Ashcroft v. Iqbal*, each of these conclusory assertions is to be ignored. 129 S.Ct. 1937, 1951 (2009) ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").  The plaintiff has failed to plead any facts that would permit the reasonable inference that the defendants activities were motivated by an intent to discriminate against plaintiff on the basis of race. *See Iqbal*, 129 S.Ct. 1949.  Therefore, it cannot state

a claim under §§ 1981, 1982, and 1985, and these claims must be DISMISSED.

5. *State Law Claims*

In addition to the federal claims, plaintiff asserts numerous claims under state law.[19] However, because the Court has dismissed the plaintiff's federal claims, the Court dismisses the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Absent an independent basis for federal subject matter jurisdiction, plaintiff's Texas state law claims may remain in federal court only if this Court decides to exercise supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367. Under this statute, the court may decline to exercise supplemental jurisdiction over a pendent state law claim if (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; or (3) the district court has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(1)-(3)

The Court notes that all federal claims over which it has jurisdiction have been dismissed. When such is the case, the Court has wide discretion to dismiss pendent state law claims. *See Robertson v. Neuromedical Center*, 161 F.3d 292, 296 (5th Cir. 1998); *Bennett v. City of New Orleans*, 2004 WL 60316 at *9 (E.D. La. 2004). However, when the federal claims are dismissed before trial, such as here, the general rule is to dismiss pendent state law claims. *See Holland v. GEXA Corp.*, 161 Fed. Appx. 364, 366 (5th Cir. 2005). As the Supreme Court has stated,

Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties . . . . Certainly, if the federal claims are dismissed

_____

[19] Plaintiff asserts claims under Texas state law for tortuous interference, civil conspiracy, defamation, and unjust enrichment.

before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130 (1966).

Furthermore, all of the plaintiff's state claims arise under Texas law, not Louisiana law. Thus, this Court has no incentive to retain jurisdiction over the plaintiff's pendent state law claims now that the federal claims have been dismissed. Plaintiff's state law claims are therefore DISMISSED without prejudice so that the plaintiff may re-file those claims in Texas state court should it so choose.

6. *The Noerr-Pennington Doctrine Bars all Claims*

As the plaintiff's federal claims have been dismissed on other grounds, the Court need not address the applicability of the Noerr-Pennington doctrine.

7. *Conclusion*

Accordingly, IT IS ORDERED that that defendants' motion to dismiss for improper venue is DENIED.

IT IS FURTHER ORDERED that plaintiff's federal claims under 15 U.S.C. § 1, 2, 13, 14 and 42 U.S.C. § 1981, 1982, 1985 are DISMISSED.

IT IS FURTHER ORDERED that plaintiff's remaining state law claims for lack of subject matter jurisdiction under 28 U.S.C. § 1367 are DISMISSED without prejudice.

IT IS FURTHER ORDERED that defendants' motion to transfer is MOOT.

New Orleans, Louisiana, this 24th day of August, 2010.

Helen G. Berrigan
United States District Judge